UNITED SURGICAL STEEL COMPANY, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1680–68.    Filed June 9, 1970.

*Bishop N. Barron*, for the petitioner.
*Robert W. Goodman*, for the respondent.

1218

OPINION

*Issue 1. Reserve for Bad Debts for Guaranteed Debt Obligations*

In its returns for the taxable years ended November 30, 1962, 1963, and 1964, the petitioner deducted additions to its reserve for bad debts on account of conditional sales contracts sold to United Discount Co., Inc., payment of which was guaranteed by the petitioner. In the examination of those returns, the deductions of the additions to the reserve were disallowed by the respondent and the resulting deficiencies were assessed on April 1, 1966.

In the meanwhile, on February 16, 1966, the petitioner filed an Application for Tentative Carryback Adjustment (Form 1139) for the taxable year ended November 30, 1965, showing a net operating loss carryback in an amount sufficient to offset its taxable income, as determined by the respondent, for the taxable years ended November 30, 1962 and 1963, and to reduce substantially its taxable income for the year ended November 30, 1964. Thereafter, on February 13, 1967, the petitioner filed an Application for Tentative Carryback Adjustment (Form 1139) for the taxable year ended November 30, 1966, showing a net operating loss carryback sufficient in amount to offset the balance of its taxable income, as determined by the respondent, for the taxable year ended November 30, 1964.

Upon later examination of the petitioner's returns for the taxable years ended November 30, 1965 and 1966, the respondent determined that the petitioner had realized taxable income for such years.

In a notice of deficiency dated January 18, 1968, the respondent asserted deficiencies for the taxable years ended November 30, 1962, 1963, and 1964.[2] The respondent also asserted deficiencies for the taxable years ended November 30, 1965 and 1966, resulting from the recomputation of the income (loss) for such years. The petitioner has sought a redetermination of those deficiencies.

The notice of deficiency set forth a recomputation of the tax liability for the taxable years ended November 30, 1962 to 1966, inclusive,

---

[2] The respondent did not elect to assess the deficiencies for the taxable years ended Nov. 30, 1962, 1963, and 1964, resulting from the tentative carryback adjustment "as if it were due to a mathematical error" under sec. 6213(b)(2).

commencing with the tax liability shown in the return for each of those years and setting forth all prior adjustments, credits and/or refunds.

In its petition, the petitioner put in issue not only respondent's determination with respect to the taxable years ended November 30, 1965 and 1966, but also the prior adjustments with respect to the years ended November 30, 1962, 1963, and 1964, whereby the respondent disallowed the deduction of the additions to the reserve for bad debts on account of the guaranteed obligations discounted with United Discount Co., Inc. The petition states:

The disallowance of bad debts for the fiscal years ended November 30, 1962, November 30, 1963, and November 30, 1964 as a result of a prior examination (February 11, 1966) was prior to the enactment of Section 166 (9) [sic], U.S.I.R.C., and, consequently, the disallowance of such amounts by the Commissioner is erroneous. The deduction for addition to Reserve for Bad Debts for the fiscal years ended November 30, 1965 and November 30, 1966 as shown by Petitioner's returns for such respective years is correct.

Tax settlements previously agreed upon between Petitioner and the Commissioner for the fiscal years ended November 30, 1962, November 30, 1963, and November 30, 1964 were affected by the addition of Section 166(g) (4) (c) to the U.S.I.R.C. as to Bad Debt Reserves carried on Petitioner's books for any taxable year ending before October 22, 1965. Petitioner did have a Reserve for Bad Debts on their [sic] books as of the end of the fiscal year 1964, November 30, 1964. The subject addition to the Internal Revenue Code affects all the periods here involved.

The respondent contends that the petitioner's claim to the allowance of a reserve for bad debts under section 166 (g) is barred by the statute of limitations and, in any event, is not before the Court for decision.

With respect to this issue there is thus presented for decision (1) whether the petitioner qualifies for the adjustment under section 166(g) and (2) whether the petitioner's claim for the adjustment is timely and before this Court.

Section 1 of Pub. L. 89–722 (Nov. 2, 1966), 80 Stat. 1151, amended section 166 by adding section 166 (g) to allow deductions for additions to reserves for guaranteed debt obligations.[3] With respect to taxable

---

[3] Sec. 166 (g) (1) provides as follows:

(g) RESERVE FOR CERTAIN GUARANTEED DEBT OBLIGATIONS.—

(1) ALLOWANCE OF DEDUCTION.—In the case of a taxpayer who is a dealer in property, in lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) for any taxable year ending after October 21, 1965, a deduction—

(A) for a reasonable addition to a reserve for bad debts which may arise out of his liability as a guarantor, endorser, or indemnitor of debt obligations arising out of the sale by him of real property or tangible personal property (including related services) in the ordinary course of his trade or business; and

(B) for the amount of any reduction in the suspense account required by paragraph (4) (B) (1).

years ending before October 22, 1965, section 2 of Pub. L. 89–722 provides as follows:

Sec. 2. (a) Except as provided in subsections (b) and (c), the amendments made by the first section of this Act shall apply to taxable years ending after October 21, 1965.

(b) If—

(1) the taxpayer before October 22, 1965, claimed a deduction, for a taxable year ending before such date, under section 166(c) of the Internal Revenue Code of 1954 for an addition to a reserve for bad debts on account of debt obligations described in section 166(g)(1)(A) of such Code (as amended by the first section of this Act), and

(2) the assessment of a deficiency of the tax imposed by chapter 1 of such Code for such taxable year and each subsequent taxable year ending before October 22, 1965, is not prevented on December 31, 1966, by the operation of any law or rule of law,

then such deduction on account of such debt obligations shall be allowed for each such taxable year under such section 166(c) to the extent that the deduction would have been allowable under the provisions of such section 166(g)(1)(A) if such provisions applied to such taxable years.

In the report accompanying the bill, the Committee on Ways and Means explained this provision as follows:

*Taxpayers claiming deductions for years ending before October 22, 1965.*—The bill provides that if a taxpayer before October 22, 1965, claimed a deduction (for a taxable year ending before that date) for an addition to a reserve for bad debts (section 166(c)) on account of debt obligations of the guaranteed type referred to with respect to the new reserve, then this deduction is to be allowed (under the existing general bad debt reserve) for the prior year in question to the same extent that it would have been allowable if the new reserve had been available in the earlier year or years. However, such a deduction is to be available for one of these prior years only if the statute of limitations has not run (by December 31, 1966) for either this or any subsequent year. Thus, for example, if the taxpayer claimed a deduction under the existing general bad debt reserve for guaranteed obligations for the year 1960 and that year and all subsequent years are open, deductions may be taken for the year 1960 and all subsequent years ending before October 22, 1965 (whether or not the taxpayer claimed the deduction for all of the subsequent years). However, if the taxpayer claimed the deduction for the year 1960 and that year is still open but the year 1961 is not open, no deduction can be taken for the year 1960 or 1961. In such case, if the taxpayer also claimed a deduction for 1962, deductions can be taken for 1962 and subsequent years ending before October 22, 1965 (if all of these years are open). [H. Rept. No. 2157, 89th Cong., 2d Sess., p. 5.]

In the technical explanation, the same report states:

The taxpayer may have claimed the deduction in his original return for the taxable year, in an amended return, or in a claim for refund, if such return, amended return, or claim for refund was filed before October 22, 1965. If such a claim was made and the assessment of a deficiency of any tax imposed by chapter 1 for the taxable years involved is not prevented on December 31, 1966, by the operation of any law or rule of law, then the taxpayer's deduction under section

166 of the code is to be computed under subsection (c) by making a reasonable addition to his reserve for bad debts. The taxpayer's balance in his reserve for bad debts under section 166(c), to the extent that it is attributable to obligations described in section 166(g)(1)(A), is his opening balance of his reserve for bad debts under paragraph (1)(A) of section 166(g) for his first taxable year ending after October 21, 1965. Accordingly, his balance of his reserve for bad debts under section 166(c) is reduced by a corresponding amount. [H. Rept. No. 2157, 89th Cong., 2d Sess., p. 9.]

In its returns for the taxable years ended November 30, 1962, 1963, and 1964, the petitioner maintained a reserve for bad debts with respect to the conditional sales contracts it sold to United Discount Co., Inc. The statute of limitations for the assessment of any deficiency for the petitioner's taxable years 1962 to 1964, inclusive, had not run as of December 31, 1966. Initially the petitioner met the conditions required in order for a taxpayer to establish a reserve for guaranteed debt obligations for the taxable years ended before October 22, 1965.

While the petitioner initially met the required conditions, it does not follow that the petitioner had an unlimited period of time within which to claim the benefits of Pub. L. 89–722. To avail itself of the deduction under section 2(b)(2) not only must the taxable year in question be open for the assessment of a deficiency as of December 31, 1966, but also at the time that the taxpayer seeks to claim the benefit.

The petitioner's returns for its taxable years ended November 30, 1962, 1963, and 1964, were examined, and the respondent disallowed any deductions for a reserve for bad debts on account of guaranteed debt obligations. That determination was accepted by the petitioner on February 1, 1966, and the resulting deficiencies were assessed on April 1, 1966. These deficiencies were offset on April 11, 1966, and March 17, 1967, by the carryback adjustment from the petitioner's taxable years ended November 30, 1965 and 1966, pursuant to section 6411(b).

By notice of deficiency dated January 18, 1968, respondent subsequently determined that the amounts credited pursuant to section 6411(b) were excessive and asserted deficiencies for the petitioner's taxable years ended November 30, 1962, 1963, 1964. When the respondent took this action, the petitioner first claimed the right under section 2 of Pub. L. 89–722 to deduct a reserve for guaranteed debt obligations for its taxable years ended November 30, 1962, 1963, and 1964.

As of January 18, 1968,[4] and as of January 28, 1968,[5] the general statute of limitations barred the assessment of a deficiency for the taxable years ended November 30, 1962 and 1963. Since, however, the proposed deficiencies for such years were attributable to the application to the taxpayer of a net operating loss carryback, the additional period for assessing a deficiency on that ground had not expired. Sec. 6501

[4] The date of the notice of deficiency.
[5] The date of the filing of the claim for refund.

(h).[6] This did not toll the statute of limitations with respect to a deficiency resulting from any other adjustments for the barred years. *Bunn's Auto Sales, Inc.*, 35 T.C. 861 (1961). See also *Ione P. Bouchey*, 19 T.C. 1078; *Edward G. Leuthesser*, 18 T.C. 1112 (1952).

When the notice of deficiency was issued and the petitioner filed a claim for the benefits of Pub. L. 89–722, the taxable years 1962 and 1963 were not open for the assessment of a deficiency which might result from a change in the method of deducting losses on account of guaranteed obligations under section 2 of Pub. L. 89–722. The petitioner's claim for the adjustment under that section with respect to the years ended November 30, 1962 and 1963, was not timely and is disallowed.

The general statute of limitations had not run with respect to the taxable year ended November 30, 1964, when the notice of deficiency was mailed and the petitioner filed a claim for the benefits of Pub. L. 89–722. By reason of the filing of the petition, the assessment of a deficiency for the taxable year 1964 is still open. Sec. 6503(a)(1). Thus, the petitioner is entitled to claim the adjustment under section 2(b) of Pub. L. 89–722 with respect to that taxable year.

The jurisdiction of this Court to consider that claim can hardly be open to question. The notice of deficiency with respect to the taxable year ended November 30, 1964, was mailed within 3 years from the filing of the return. The respondent was not limited to the tentative carryback adjustment under section 6501(a). No basis exists for limiting the jurisdiction of this Court.

Having made a timely claim, the petitioner is entitled to a deduction for additions to a reserve for bad debts with respect to guaranteed debt obligations for its taxable year ended November 30, 1964, to the extent provided in section 2(b) of Pub. L. 89–722.

### *Issue 2. Disposition of Installment Obligations*

With respect to the transaction with the First National Bank of Montgomery, the respondent argues, first, that the agreement with the bank "amounted to much more than a mere pledge" of the installment obligations and, secondly, even assuming that the transaction

---

[6] Sec. 6501(h) provides:

(h) Net Operating Loss or Capital Loss Carrybacks.—In the case of a deficiency attributable to the application to the taxpayer of a net operating loss carryback or a capital loss carryback (including deficiencies which may be assessed pursuant to the provisions of section 6213(b)(2)), such deficiency may be assessed at any time before the expiration of the period within which a deficiency for the taxable year of the net operating loss or net capital loss which results in such carryback may be assessed. In the case of a deficiency attributable to the application of a net operating loss carryback, such deficiency may be assessed within 18 months after the date on which the taxpayer files in accordance with section 172(b)(3) a copy of the certification (with respect to the taxable year of the net operating loss) issued under section 317 of the Trade Expansion Act of 1962, if later than the date prescribed by the preceding sentence.

was a "pledge," that there was a disposition of the installment obligations within the meaning of section 453 (d) (1) on the authority of Rev. Rul. 65–185, 1965–2 C.B. 153.

Section 453 (d) (1) provides as follows:

(d) GAIN OR LOSS ON DISPOSITION OF INSTALLMENT OBLIGATIONS.—

(1) GENERAL RULE.—If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and—

(A) the amount realized, in the case of satisfaction at other than face value or a sale or exchange, or

(B) the fair market value of the obligation at the time of distribution, transmission, or disposition, in the case of the distribution, transmission, or disposition otherwise than by sale or exchange.

Any gain or loss so resulting shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received.

The respondent does not contend that the installment obligations were "satisfied," "distributed," "transmitted," or "sold." Rather the respondent argues that the transactions were "otherwise disposed of." The respondent recognizes, however, and this Court has held, that the pledge of an installment obligation as collateral security for a loan is not *generally* a "disposition" of that obligation within the meaning of section 453 (d) (1). *Town & Country Food Co.*, 51 T.C. 1049, acq. 1969–2 C.B. XXV.

The respondent contends, nevertheless, that where the amount borrowed on the collateral is "substantially equal" to the obligation, there is a disposition of the obligation. Rev. Rul. 65–185. Without expressing any opinion with respect to that ruling as applied to the example set forth therein, which materially differs from the facts in this case, there is no basis in law upon which to conclude that merely because the amount borrowed is substantially equal to the face amount of the collateral, the taxpayer has thereby disposed of the collateral. This might follow under the facts of a particular case, such as where the transaction was found not to be loan, but cannot be advanced as a rule of law. *Town & Country Food Co.*, *supra*; cf. *Joe D. Branham*, 51 T.C. 175 (1968).

In *Town & Country Food Co.*, *supra*, this Court had under consideration a financing plan somewhat similar to that in the case before us. The Court said:

Section 453(d) predicates its application upon a sale or exchange or other disposition of installment obligations. We think it is obvious that a disposition involves the relinquishment of the substantial incidents of ownership of the obligations. It may well be that in some instances involving claimed borrowing arrangements the taxpayer parts with such a substantial portion of his ownership rights in the obligations as to require the conclusion that he has, in effect, sold or otherwise disposed of the obligations. On the other hand, if it is clear

that the taxpayer has merely subjected the obligations to a lien for the payment of indebtedness, he does not lose the privilege of reporting the income from the installment method. As stated in *Elmer* v. *Commissioner* (C.A. 2) 65 F. 2d 568, affirming 22 B.T.A. 224:

"If a merchant discounts his customer's note at a bank, endorsing it, but getting immediate credit for its discount value, it would be a most unnatural thing to consider it a loan from the bank. He remains liable if the customer defaults, but the collection is in the bank's hands, and the transaction is closed in the absence of a default. If on the other hand, a merchant pledges his accounts to a "finance" company and collects them himself, paying the loan out of his collections, it is clearly a loan, and has always been so considered. * * *"

The facts here clearly establish that the transaction between the petitioner and the bank was *in form*, as well as substance, a loan and not a sale of the collateral. The petitioner and its guarantors entered into an agreement with the bank pursuant to which the bank agreed to extend a line of credit up to a maximum of $650,000, subsequently increased to $850,000. The petitioner executed a note payable to the bank for the full amount of its authorized borrowings, or the sum of $850,000. The note was described as a "draw" note by the lender which meant that the note itself did not represent the amount owing but was intended, along with the collateral, to secure loans by the bank to the petitioner.

Pursuant to the terms of the loan agreement, the petitioner assigned its installment obligations to the bank and became entitled to borrow up to 88 percent of the face amount of such obligations. The petitioner continued to make all collections on the obligations, which were deposited daily in a special bank account. The funds thus deposited could not be withdrawn by the petitioner but the total amount on deposit would be credited to the petitioner's revolving account on a weekly basis. In the case of a default on any installment obligation, the petitioner was required to reduce its account with the bank by an equal amount and the obligation was released from escrow.

While the procedures, pursuant to which the petitioner financed its installment obligations, may not have differed in some respects from the procedures which are followed where a taxpayer discounts or sells its trade obligations to a bank subject to recourse, other duties and restrictions imposed on the petitioner served to distinguish the transaction from a sale or disposition of the installment obligations.

The bank did not realize any income from the installment obligations but only realized interest charges measured by the actual balance owing by the petitioner. Thus, while the bank assumed no risk, other than as a lender of money to the petitioner, the bank could realize no gain except as interest on that loan.

The petitioner continued to handle all collections and otherwise to service its customers. In fact, there was no contact between the cus-

tomer and the bank. As far as the customer knew, the petitioner was the person to whom he was indebted.

The bank did not look to the debtors under the installment obligation for payment. The obligation to pay the bank remained at all times an obligation of the petitioner and its guarantors. The loan agreement makes this clear.

The loan agreement imposed restrictions on the operations of petitioner which are wholly inconsistent with the view that the transaction was not a loan by the bank to the petitioner. For example, the petitioner was required to keep its records in a manner satisfactory to the bank; the bank had the right to audit the books of petitioner; the petitioner had to furnish the bank periodically with financial statements of its operations; the petitioner had to pay all its taxes as such taxes came due; the petitioner had to keep its property insured; the petitioner could not purchase any additional fixed assets other than automobiles and individual purchases of less than $1,000 without prior approval of the bank; and, the petitioner was restricted in the payment of compensation, the creation of other indebtedness, and the payment of dividends.

In applying Rev. Rul. 65–185 to this case, respondent would ignore the particular facts upon which that ruling was predicated. The ruling states:

X, an automobile dealership, sells most of its automobiles under an arrangement in which the customer makes a cash down payment and executes a conditional sales contract providing for installment payments on the principal balance due and for the payment of interest.

Following the sale of an automobile under this arrangement, X applies to Y, an unrelated finance company, for a loan in an amount substantially equal to the face amount of the customer's contract. If Y grants the loan, X executes an installment note for the full amount of the loan. The note provides for the repayment of the loan by X over a term and at intervals identical with the term and intervals at which the customer will make payments pursuant to his installment contract.

Under the loan agreement, X assigns the customer's installment contract to Y as collateral security for the repayment of its own note. The agreement designates Y as X's agent to collect the installment payments from the customer for X's benefit. The customer is informed that payments are to be made to Y and is furnished a payment book by Y.

Under the terms of the loan agreement between X and Y installment payments received from the customer are applied by Y to the payment of X's note. However, if the customer's payments are not made to Y on a basis permitting their timely application to X's obligation, X is required to make the payments on its own note to Y in accordance with the terms of the loan agreement. If X should fail to make a payment under such circumstances, it is considered in default and Y may demand payment of the total amount remaining due from X under the agreement.

The ruling refers to a transaction whereby the dealer assigned the obligation to the finance company on practically a "dollar for dollar" basis. The dealer's payments to the finance company were scheduled

at identical intervals with the customer's obligation under the note. The finance company took over the collection of the obligation. The payment book and other indicia of indebtedness were issued in the name of the finance company, and the customer made payments directly to the finance company.

On the other hand, the petitioner did not borrow up to the face amount of the installment obligations. The loan agreement provided for a "reserve." As a matter of practice, the petitioner did not even borrow up to the maximum amount allowable. The petitioner's customers were not aware of any assignment. The petitioner collected the funds in the first instance and paid over those collections to the bank. There was no distinction insofar as the petitioner's customers were concerned between the accounts pledged with the bank and those accounts not subject to the loan agreement.

For reasons stated, and on the authority of *Town & Country Food Co.*, *supra*, it is our opinion that the petitioner did not dispose of its installment obligations within the meaning of section 453(d)(1). Accordingly, the petitioner is entitled to use the installment basis in reporting the gain on the sales represented by such obligations.

## Issue 3. Loss Ratio

Our decision that the petitioner did not dispose of the installment obligations within the meaning of section 453(d)(1) makes it necessary to recompute petitioner's reserve for bad debts for its taxable years ended November 30, 1965 and 1966, using as a basis the unrecovered cost of the goods sold rather than the face amount of the installment notes subject to the loan agreement with the bank. See *Estate of Maurice S. Saltstein*, 46 B.T.A. 774 (1942); *Wilbur Glenn Voliva*, 10 B.T.A. 911 (1928), affd. 36 F. 2d 212 (C.A. 7, 1929); see also *Investors Discount Corp.*, 48 T.C. 767, 771 fn. 6 (1967); I.T. 3957, 1949-1 C.B. 65.

Petitioner's loss ratios for its taxable years ended November 30, 1964, 1965, and 1966, have been determined as 7.010 percent, 7.034 percent, and 7.275 percent, respectively. The petitioner's reserve for bad debts for its taxable years ended November 30, 1964, 1965, and 1966, are to be recomputed using those loss ratios.

*Decision will be entered under Rule 50.*