JOHN B. MATHERS AND LAURA C. MATHERS, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3014–68. Filed February 24, 1972.

*Warren L. Finch*, for the petitioners.
*Robert W. Goodman*, for the respondent.

ATKINS, *Judge:* Respondent determined deficiencies in income tax against the petitioners for the taxable years 1961, 1962, and 1964 in the amounts of $12,793.86, $3,227.13, and $20,006.95, respectively. Petitioners raised certain issues in their petition with regard to which they introduced no evidence and accordingly they are considered to have been abandoned. The issues remaining for decision are whether petitioners sold or otherwise disposed of certain installment obligations in 1964 so that the entire amount of gain must be included in their taxable income for 1964 and whether petitioners realized taxable income in 1964 from the collection of State and local sales tax in an amount greater than the amount of such tax they remitted in 1964 to the taxing authorities. In an amendment to his answer made at the time of the trial, respondent asserted that, if the petitioners did not dispose of the above installment obligations so that the entire gain was taxable income in 1964, the petitioners deducted $37,106.64 more as

discount expense than they were entitled to deduct for 1964. The deficiencies for the taxable years 1961 and 1962 are in issue only because they depend upon the allowance of carrybacks to such years of a net operating loss for the taxable year 1964.

John B. Mathers and Laura C. Mathers are husband and wife who at the time of the filing of the petition herein resided in Mobile, Ala. They filed their joint Federal income tax returns for the taxable years 1961 and 1962 with the district director of internal revenue, Birmingham, Ala., and their joint Federal income tax return for the taxable year 1964 with the director, internal revenue service center, southeast region, Chamblee, Ga. As a matter of convenience, hereinafter all references to the petitioner are to the petitioner John B. Mathers.

On October 29, 1965, petitioners submitted to respondent a Form 870, Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment, setting forth agreed deficiencies for their taxable years 1961 and 1962 in the amounts of $9,903.12 and $3,936.43, respectively, and an agreed penalty of $76.50 for their taxable year 1961. On October 29, 1965, petitioners also submitted to respondent a Form 1045, Application for Tentative Carryback Adjustment, setting forth a net operating loss for their taxable year 1964 in the amount of $48,789.93 to be carried back to their taxable years 1961 and 1962, and shown as decreasing their tax liabilities for such years in the amounts of $12,793.86 and $3,227.13, respectively. Pursuant to such Form 1045, respondent, on March 25, 1966, made a tentative allowance of the net operating loss carryback to the taxable years 1961 and 1962.

On March 5, 1960, petitioner began to operate a retail furniture business in Mobile, Ala., as a sole proprietor under the trade name of Mathers Furniture Co. By the end of the taxable year 1964, he was operating five separate retail furniture and appliance stores in Mobile and its vicinity. His business consisted largely of selling relatively inexpensive furniture and appliances to customers on credit. During the period 1960 through 1964, he sold a large volume of furniture on this basis.

The majority of petitioner's sales were made under conditional sales contracts which secured installment notes that were to be paid, generally, over a 2-year period. The face amount of such a note equaled the price of the merchandise sold plus State and local sales tax, at times a delivery charge, plus finance or interest charges for the extension of credit. The reverse of the form for the conditional sales con-

tract provided for the assignment of all petitioner's rights in the contract, as follows:

For value received, the undersigned does hereby sell, assign and transfer to _____, the contract on the reverse side and the note referred to therein, and all right, title and interest of the undersigned therein and in the property described therein and in the purchase price thereof; and authorize(s) said assignee or any holder thereof to do every act and thing necessary to collect and discharge the same, with power to take legal proceedings in the name of the undersigned or any assignee or holder. * * *

It provided for petitioner to endorse the note with or without recourse. After entering the furniture and appliance business in 1960, petitioner elected to report his income therefrom on his Federal income tax returns by the installment method of accounting.

In order to obtain more money for use in his business, petitioner entered into an agreement with Mason Plan Co., a finance company in Mobile, to discount his installment notes with it. On November 15, 1960, their agreement was formalized in a written "Master Agreement" which provided in part as follows:

WHEREAS, we the undersigned [petitioner] desire to assign and discount with you, [Mason Plan Co.] with recourse on us, notes, secured by Chattel Mortgage, Conditional Sales Contracts, or other obligations (all of which are hereinafter referred to as "notes") signed by our customers in connection with their purchase from us of personal property on credit; and

WHEREAS, in consideration of your discounting said "notes" as may be acceptable to you and your paying us the price which you shall from time to time establish, we agree to the following terms which will apply to all notes which are discounted subsequent to the date of this agreement and any "notes" which may have been discounted with you heretofore:

### RESERVE ACCOUNT

In addition to our assignment on each "note" discount with you, we agree that on all "notes" so discounted, a sum equal to 10% (of the face amount of each "note") (of the amount due us by you on each "note") shall be retained by you and set up on your books as a reserve account. The monies placed in this account shall under no circumstances be considered as belonging to us and we shall have no right whatsoever to the return of such monies or any part thereof until said reserve account equal 100% of the total unpaid balances of all outstanding "notes", or until this contract has been terminated as provided below and all "notes" which we have discounted to you are liquidated. It is clearly understood that the reserve may be used by you at your option to pay or satisfy any "note" in default or delinquent installments of a note, any loss, cost, damages, or expenses which you may suffer or incur by reason of our default or of any breach by us of any of the provisions in this agreement or of any provision in the notes as contemplated hereunder.

### WARRANTIES

We warrant that all "notes" will be genuine in every respect and shall be free from all set-offs; the property sold by us will be free from all liens; all state-

ments in said "notes" will be true and complete; the property will have been completely installed or delivered and unconditionally accepted by the buyer on the date such "notes" are discounted to you; the property will be the identical property described in the "notes"; should the customer return any property to us which is covered by any "note" discounted to you, we agree to notify you immediately of such fact; and to provide service on all property sold by us in accordance with our contract with the customer and with the policies established by the manufacturer thereof.

## RECORDS

We agree to make appropriate entries on our books disclosing all transactions to you. We agree to furnish you with a certified copy of an independent audit report whenever you deem it necessary, and whether or not you request such we will furnish you with a report within ninety days after the end of the fiscal year. Also, we agree to furnish you with signed financial statements at the end of each calendar quarter.

## BANKRUPTCY, ETC.

In the event we become insolvent or cease to do business as a going concern, or if we make an assignment for the benefit of creditors, or if a petition for a receiver or in bankruptcy is filed by or against us, it is specifically understood that the reserve shall be held by you and used in accordance with this agreement until all "notes" discounted from us are liquidated.

## COLLECTIONS

You shall have the right to make collections on all "notes" which we discount to you. We agree not to solicit or make any collections or repossessions with respect to any such "note" and not to accept the return of or make any substitutions of any personal property covered thereby, except with your written instructions pertaining to a particular "note" or "notes."

This was the only written agreement ever executed by petitioner and Mason Plan Co. and was in effect through the end of 1964.

Petitioner periodically transferred installment notes and the conditional sales contracts securing such notes to Mason Plan Co. He endorsed the notes to Mason Plan Co. with full recourse. Upon receiving the notes, Mason Plan Co. prepared a ledger card in each instance showing the name of the customer, the amount of installments due on each note, and the due dates. It entered the face amount of the notes on its books and calculated a discount based on such face amount. It also calculated the amount of the reserve that it maintained under the terms of the master agreement. The balance of the face amount of the notes, after subtracting the discount and the reserve, was either paid to petitioner at that time or added to his account with Mason Plan Co. to be paid to him at a subsequent time when he decided that he wanted it. Thus, there were many times when petitioner received money from Mason Plan Co. without submitting any additional installment notes. In its discretion Mason Plan Co. occasionally paid money to petitioner, at his request, in excess of the amount payable to

670

him in his account and petitioner thereafter transferred a sufficient amount of notes to Mason Plan Co. to cover the amount that he had received. Most of the time, petitioner requested that Mason Plan Co. pay him the money in multiples of $100 rather than the exact balance remaining after subtracting the discount and the amount to be reserved.

Mason Plan Co. never collected any of the installments due under any of the notes which it had acquired from petitioner, and petitioner's customers never knew that their notes had been endorsed to Mason Plan Co. Rather, it looked to petitioner for payment of the installments due under the notes. Petitioner collected the installments due from its customers and remitted the money once per week to Mason Plan Co. with a list of the customers' names and dates and amounts of payments. He also kept Mason Plan Co. aware of his customers' defaults. He continued to pay Mason Plan Co. the amounts due under the installment notes even when he was unable to collect the installments from his customers, because he had endorsed the notes to Mason Plan Co. with full recourse, and it looked to him for payment. Mason Plan Co. recorded on each ledger card kept for each note the installments which it received from the petitioner. Mason Plan Co. itself never checked the credit of petitioner's customers, but was furnished the credit information which the petitioner had obtained.

When a customer was in default on the installments due under his note, petitioner went and got the conditional sales contract from Mason Plan Co. He then began legal proceedings in his own name under the contract to enforce payment or repossess the merchandise sold. Before getting the contract from Mason Plan Co., petitioner would either substitute other notes for the balance outstanding on the one in default or pay money to Mason Plan Co. for such balance. After the legal proceedings were concluded, any amount remaining uncollected on the note was charged off by petitioner to bad debts.

For his taxable years prior to 1964 the petitioner, in reporting his income from his furniture and appliance business on his Federal income tax returns, reported both his collections on installment notes that he did not discount with Mason Plan Co. and the face amount of the notes that he discounted with Mason Plan Co. as collections received on installment accounts before computing his realized gross profits for the year involved. The amount of the discount from the face amount of the notes discounted to Mason Plan Co. was claimed as a deduction.

During 1964, petitioner transferred notes to Mason Plan Co. on which the total face amount owing at the time of discount was $269,671.38, at discounts, i.e., prepaid interest, totaling $62,415.49. The

amount of notes discounted, the discounts thereon, and the amount petitioner received during the months of 1964 were as follows:

| Month | Face amount | Discount | Difference |
|---|---|---|---|
| January | $21,673.32 | $4,903.32 | $16,770.00 |
| February | 12,876.00 | 3,111.00 | 9,765.00 |
| March | 26,311.71 | 5,993.12 | 20,318.59 |
| April | 34,108.74 | 7,828.74 | 26,275.00 |
| May | 18,277.16 | 4,108.16 | 14,169.00 |
| June | 20,363.80 | 4,748.80 | 15,615.00 |
| July | 78,054.72 | 18,818.61 | 59,236.11 |
| August | 19,360.12 | 4,740.12 | 14,620.00 |
| September | 14,597.72 | 3,382.72 | 11,215.00 |
| October | 5,993.43 | 791.24 | 5,202.19 |
| November | 3,247.38 | 752.38 | 2,495.00 |
| December | 14,812.28 | 3,237.28 | 11,575.00 |
| Totals | 269,671.38 | 62,415.49 | 207,255.89 |

Petitioner's cash receipts journal account entitled "Collections for Mason Plan" shows that during 1964 he paid to Mason Plan Co. a total of $75,590.52 that he collected on notes he had discounted to it during that year.

During 1964, the petitioner reacquired from Mason Plan Co. notes that he had discounted to it in 1964 and prior years in the total amount of $98,518.66 and also made payments to Mason Plan Co. in the total amount of $8,215.70. No notes were reacquired by the latter payments. He paid $72,975.76 for notes discounted in years prior to 1964 and $33,758.35 for notes discounted in 1964. In addition, petitioner also charged off on his books and records notes that he had discounted in 1964 to Mason Plan Co. in the total amount of $24,365.98. The notes discounted to Mason Plan Co. in 1964 that were either reacquired or charged off were recorded by the petitioner either in his repossession account or in his bad debt account.

The net amount owed Mason Plan Co. on December 31, 1964, on the basis of the notes the petitioner had discounted to it during 1964 was as follows:

| | | |
|---|---|---|
| Total amount of notes transferred to Mason Plan Co | | $269,671.38 |
| Less: Repayments to Mason Plan Co. in 1964 | $75,590.52 | |
| Notes discounted to Mason Plan Co. in 1964 and reacquired from it in that year | 33,758.35 | |
| Notes discounted to Mason Plan Co. in 1964 and charged off by petitioner on his books and records during that year | 24,365.98 | 133,714.85 |
| Net amount owed | | 135,956.53 |

The amount of $135,956.53 includes an amount of $7,255.59 for State and local sales taxes.

On his return for 1964 petitioner reported gross collections of $6,565.09 from cash sales and gross collections of $281,746.34 from 1962, 1963, and 1964 installment obligations, or total gross collections in 1964 of $288,311.43. Included in such total reported collections was the $75,590.52 which petitioner collected on notes discounted to Mason Plan Co. during 1964. In computing his net collections of installment obligations and gross profit with respect thereto for 1964, petitioner excluded an amount of $13,930.27 as State and local sales taxes.

In computing the amount of unrealized gross profit on his 1964 return, the petitioner reported an amount of $437,311.61 as the amount of unrealized net receivables as of December 31, 1964. Again the sales taxes included in the face amount of such notes were excluded. Included in the reported unrealized net receivables was the amount of $128,-700.94 which represented the net amount owing to Mason Plan Co. on December 31, 1964, for notes discounted to it in 1964, less the State and local tax included therein in the amount of $7,255.59. Petitioner calculated the amount of unrealized gross profit by applying to the unrealized net receivables the following percentages of gross profit:

| Year | Percentage |
|---|---|
| 1962 | 40. 12 |
| 1963 | 53. 58 |
| 1964 | 59. 21 |

The correct percentages of gross profit from his furniture and appliance business were as follows:

| Year | Percentage |
|---|---|
| 1962 | 36. 26 |
| 1963 | 51. 88 |
| 1964 | 59. 21 |

On his return for 1964, petitioner claimed as a deduction the discount of $62,415.49 on the face amount of the notes transferred to Mason Plan Co. in 1964.

During 1964, petitioner remitted sales taxes to the State of Alabama and to those cities and counties therein to which such taxes were payable as follows:

| Month | Amount of sales tax | Month | Amount of sales tax |
|---|---|---|---|
| January | $223. 14 | July | $197. 96 |
| February | 231. 82 | August | 176. 54 |
| March | 150. 63 | September | –0– |
| April | 169. 81 | October | 370. 86 |
| May | 141. 77 | November | 469. 45 |
| June | 173. 23 | December | 453. 92 |
| | | Total | 2, 759. 13 |

In the notice of deficiency, respondent determined that "gross profit realized upon the disposition or sale of installment contracts to Mason Plan during the year 1964 in the aggregate amount of $128,701.04 ($135,956.53 minus sales tax of $7,255.59)[1] constitutes taxable income within the meaning of Code sections 61 and 446, to the extent of $74,315.93 at the date of disposition or sale of the contracts in 1964." Accordingly, respondent increased petitioner's taxable income by $74,315.93, computed as follows:

*UNREALIZED GROSS PROFIT PER RETURN AFTER APPLYING CORRECTED GROSS PROFIT PERCENTAGES FOR 1962 AND 1963 ACCOUNTS

|  | Net receivables | Corrected gross profit percentage | Unrealized gross profit per return* |
|---|---|---|---|
| 1962 | $7,527.88 | 36.26 | $2,729.61 |
| 1963 | 63,948.82 | 51.88 | 33,176.65 |
| 1964 | 365,834.91 | 59.21 | 216,610.85 |

Total unrealized gross profit per return after applying corrected gross profit percentages for 1962 and 1963 accounts _____ 252,517.11

UNREALIZED GROSS PROFIT AFTER ELIMINATION OF MASON PLAN CONTRACTS

|  | Net receivables per return | Less Mason Plan contracts | Balance net receivables | Corrected gross profit percentage | Corrected unrealized gross profit |
|---|---|---|---|---|---|
| 1962 | $7,527.88 | $2,215.46 | $5,312.42 | 36.26 | $1,926.28 |
| 1963 | 63,948.82 | 18,820.17 | 45,128.65 | 51.88 | 23,412.74 |
| 1964 | 365,834.91 | 107,665.41 | 258,169.50 | 59.21 | 152,862.16 |
| Total | 437,311.61 | 128,701.04 | 308,610.57 |  | 178,201.18 |

Gross profit realized on disposition or sale of Mason Plan contracts:

Unrealized gross profit per return (as corrected) _____ $252,517.11
Unrealized gross profit determined_____ 178,201.18

Gross profit realized on sale or disposition of Mason Plan contracts__ 74,315.93

The respondent also increased petitioner's income for 1964 by the amount of $18,426.73, stating as follows:

It is determined that your taxable income was understated $18,426.73, representing the difference between sales tax collected of $21,185.86 and sales tax paid of $2,759.13. Therefore, taxable income is increased $18,426.73. Of this amount $7,255.59 represents sales tax on Mason Plan contracts disposed of in 1964. * * *

The respondent also determined that petitioner did not sustain a net operating loss in 1964 and that consequently there was no net operating loss carryback available for prior years. He therefore disallowed

---

[1] $135,956.53 less $7,255.59 is actually $128,700.94, not $128,701.04. This discrepancy is nowhere explained. In view of its de minimis nature and since petitioner has not questioned it, it will be disregarded.

the tentative allowances made on March 25, 1966, for the taxable years 1961 and 1962.

OPINION

In the petition to this Court, the petitioner alleged error in the respondent's determination of the deficiency for the taxable year 1964 with regard to adjustments to the deduction for bad debts and to bad debt recoveries. At the trial no mention was made of these issues and the petitioner introduced no evidence in support of the allegations of error. And petitioner filed no briefs in this case. In view of the foregoing, we have concluded that petitioner must be deemed to have abandoned these issues. See *Ben R. Meyer*, 45 B.T.A. 228.

The first issue presented for decision is whether the installment notes transferred by petitioner to Mason Plan Co. during 1964 were sold or otherwise disposed of by petitioner to Mason Plan Co. so that the entire amount of the gain on such notes is includable in petitioner's taxable income for 1964 under section 453(d) of the Internal Revenue Code of 1954.[2]

The respondent contends that the transfer of the notes to Mason Plan Co. under the agreement constituted a disposition of such notes under section 453(d). Petitioner, on the other hand, contends that the notes were transferred merely as collateral to secure amounts which he borrowed from Mason Plan Co.

In *Town & Country Food Co.*, 51 T.C. 1049, we stated:

Section 453(d) predicates its application upon a sale or exchange or other disposition of installment obligations. We think it is obvious that a disposition involves the relinquishment of the substantial incidents of ownership of the obligations. It may well be that in some instances involving claimed borrowing arrangements the taxpayer parts with such a substantial portion of his ownership rights in the obligations as to require the conclusion that he has, in effect, sold or otherwise disposed of the obligations. On the other hand, if it is clear that the taxpayer has merely subjected the obligations to a lien for the payment of indebtedness, he does not lose the privilege of reporting the income from the installment method. As stated in *Elmer v. Commissioner*, (C.A. 2) 65 F.

---

[2] Sec. 453(d) of the Code provides in part as follows:

(d) GAIN OR LOSS ON DISPOSITION OF INSTALLMENT OBLIGATIONS.—

(1) GENERAL RULE.—If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and—

(A) the amount realized in the case of satisfaction at other than face value or a sale or exchange, or

(B) the fair market value of the obligation at the time of distribution, transmission, or disposition, in the case of the distribution, transmission, or disposition otherwise than by sale or exchange.

Any gain or loss so resulting shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received.

(2) BASIS OF OBLIGATION.—The basis of an installment obligation shall be the excess of the face value of the obligation over an amount equal to the income which would be returnable were the obligation satisfied in full.

2d 568, affirming 22 B.T.A. 224: "If a merchant discounts his customer's note at a bank, endorsing it, but getting immediate credit for its discount value, it would be a most unnatural thing to consider it a loan from the bank. He remains liable if the customer defaults, but the collection is in the bank's hands, and the transaction is closed in the absence of a default. If on the other hand, a merchant pledges his accounts to a "finance" company and collects them himself, paying the loan out of his collections, it is clearly a loan, and has always been so considered.* * *"

See also *United Surgical Steel Co.*, 54 T.C. 1215.

The written agreement between petitioner and Mason Plan Co. provided that the petitioner would assign and discount with Mason Plan Co., with recourse, notes secured by conditional sales contracts at prices to be determined by Mason Plan Co. Nowhere in such agreement is there any mention of any loan arrangement or any indication that the notes were to be transferred merely as collateral security. Under the agreement the petitioner was to receive the face amount of the notes, less a percentage thereof, as discount, a portion of which was to be held as a reserve by Mason Plan Co. We have described in some detail in the Findings of Fact the procedures followed by the parties. The individual notes and contracts were transferred to Mason Plan Co., the notes being endorsed by the petitioner with recourse, and petitioner became entitled to payments in accordance with the written agreement. Thereafter, under the agreement, Mason Plan Co. had exclusive control over the notes and contracts. It is our conclusion that the petitioner transferred the substantial incidents of ownership in the notes to Mason Plan Co. It is true that the petitioner, rather than Mason Plan Co., collected the installments on the notes. However, under the written agreement Mason Plan Co. had the right to make such collections, and we can only conclude that petitioner did so on behalf of Mason Plan Co. as its agent. See *Thos. Goggan & Bro.*, 45 B.T.A. 218. In this connection we note that during 1964 on his books petitioner recorded the payment of amounts collected on notes he had discounted to Mason Plan Co. during that year in an account labeled "Collections for Mason Plan."

At the trial both petitioner and James W. Strickland, who was vice president and general manager of Mason Plan Co., testified as to the transactions between petitioner and Mason Plan Co. Their testimony was confusing and in some respects contradictory to each other. Strickland testified to the effect that he looked to petitioner for payment of the installments on the notes and that he considered that Mason Plan Co. was loaning money to petitioner during the years 1961 through 1964, with the notes as collateral. The petitioner testified that when he first started dealing with Mason Plan Co. he sold the notes, endorsing them with recourse, but that by 1962 the arrange-

ment was changed to a loan arrangement using the notes transferred as security for the amounts borrowed. However, this testimony is inconsistent with the fact that in his returns for years prior to 1964 petitioner treated the transfers of the notes as sales thereof. Furthermore, Strickland testified that the master agreement executed in 1960 was the only written agreement entered into by the parties and that it was in effect through the year 1964. He further testified to the effect that there was no substantial difference in the procedures during 1964 and prior years. There is no evidence whatever that petitioner in 1964 or prior years ever executed any notes making himself personally liable for any amounts received by him from Mason Plan Co. So far as is shown, his only liability was pursuant to his endorsement of the notes with recourse. The petitioner also testified that sometime during 1964 a procedure was adopted whereby he executed a master note for specified amounts borrowed, with interest and installments based upon the amounts borrowed and not upon the installments due under the notes transferred. However, there was no evidence to support this statement, and Strickland testified that the master note procedure did not begin until sometime in 1965.

Upon a careful consideration of all the evidence it is our conclusion that, while petitioner and Strickland may have thought of the transactions as loans, it has not been established that there was any agreement to that effect—that is, there is no evidence that peitioner was liable as a borrower of the amounts he received from Mason Plan Co. upon the discounting of the notes. See *Elmer* v. *Commissioner*, (C.A. 2) 65 F. 2d 568. In this connection, it should be pointed out that the instant case is distinguishable from such cases as *Town & Country Food Co.*, *supra*, and *United Surgical Steel Co.*, *supra*, where the transactions purported to be loans, using the notes as collateral, and the evidence established that they were in fact loans.

In view of the foregoing, we approve the respondent's determination that in 1964 the petitioner sold or disposed of the notes to Mason Plan Co. and that he is taxable upon the gain resulting therefrom.

The second issue presented for decision is whether petitioner realized taxable income in 1964 from the collection of State and local sales taxes in that year in an amount greater than the amount of such taxes paid over by him to the taxing authorities. The parties are agreed that during 1964 the petitioner remitted sales tax to the State of Alabama and to those cities and counties to which sales tax was due in the total amount of $2,759.13. On his return for 1964, in calculating the amount of realized gross profit for such year, petitioner reported an amount of $288,311.43 as his total collections from cash and installment sales, and from this amount he subtracted an amount of $13,930.27 as the sales tax included in such collections. The total unrealized installment

payments remaining as of December 31, 1964, on the notes transferred to Mason Plan Co. during 1964 included an amount of $7,255.59 on account of State and local sales taxes.

The respondent contends that petitioner in 1964 collected an amount of $21,185.86 of State and local taxes and that since he remitted only $2,759.13, the difference of $18,426.73 constituted taxable income to him in that year.

We have set forth in the margin relevant provisions of the Alabama Sales Tax, Ala. Code, tit. 51, secs. 786(2)–786(36), effective October 1, 1959.[3] Neither party has cited any provisions dealing with such local sales tax ordinances as may have been involved here. For present purposes we will therefore assume that such ordinances are similar to the State law in essential respects.

---

[3] Sec. 786(3) provides in part as follows:

Sec. 786(3). Tax levied on gross receipts.—There is hereby levied, * * * a privilege or license tax against the person on account of the business activities and in the amount to be determined by the application of rates against gross sales, or gross receipts, as the case may be, as follows:

(a) Upon every person, firm, or corporation * * * engaged, or continuing within this state, in business of selling at retail any tangible personal property whatsoever, * * * an amount equal to four percent of the gross proceeds of sales of the business * * *

Sec. 786(6) provides in part as follows:

Sec. 786(6). Taxes due monthly; reports; exceptions.—The taxes levied under the provisions of this article, except as otherwise provided, shall be due and payable in monthly installments on or before the twentieth day of the month next succeeding the month in which the tax accrues. * * *

Sec. 786(7) provides as follows: .

Sec. 786(7). Cash sales and credit collections to be reported.—Any person taxable under this article, having cash and credit sales, may report such cash, sales, and the taxpayer shall thereafter include in each monthly report all credit collections made during the month preceding, and shall pay the taxes due thereon at the time of filing such report, but in no event shall the gross proceeds of credit sales be included in the measure of the tax to be paid until collections of such credit sales shall have been made.

Sec. 786(17) (b) provides in part as follows:

(b) Any notice, provided for by this article, of an amount due under this article shall be given or any action in court for the collection of such amount shall be begun within three years of the due date of such amount. * * *

Sec. 786(18) provides as follows:

Sec. 786(18). Tax a lien on property.—The tax together with interest and penalties imposed by this article shall be a lien upon the property of any person subject to the provisions of this article, and the provisions of the revenue laws of the state of Alabama applying to liens for license taxes shall apply fully to the taxes herein levied.

Sec. 786(20) provides as follows:

Sec. 786(20). Tax collectible by civil suit.—The tax herein levied shall constitute a debt due the state of Alabama and may be collected by civil suit, in addition to the methods herein provided, brought at any time within three years after the tax has become due and payable.

Sec. 786(25) provides in part as follows:

Sec. 786(25). Tax to be added to purchase price; refund unlawful; penalty; tax a direct tax on retail consumer.—Every person, firm, corporation, association, or co-partnership engaged in or continuing within this state in the business for which a license or privilege tax is required by this article shall add to the sales price and collect from the purchaser on all sales upon the gross receipts or gross proceeds of which there is levied by this article a sales tax at the rate of four percent, * * *. All taxes paid in pursuance to this article or any other statute enacted in this connection shall conclusively be presumed to be a direct tax on the retail consumer, pre-collected for the purpose of convenience and facility only.

Respondent points out that in Rev. Rul. 69–61, 1969–1 C.B. 57, it was recognized that the intent and purpose of the Alabama Legislature in enacting the Alabama Sales Tax was to impose the sales tax on the retail customer rather than the vendor. Consequently he concedes that the amount of sales tax collected is not to be included in petitioner's "gross profit," "total contract price," and "installment payments actually received" in computing his income under the installment method of accounting, and that the petitioner properly excluded them. However, as stated, he contends that to the extent petitioner failed to remit sales taxes collected, he was in receipt of taxable income.

Petitioner's contentions on this issue are far from clear. In his petition, the only reference to this issue was the statement that one of the errors upon which the deficiency in tax was determined was the "erroneous computation of sales tax on sales in the amount of $18,426.73." The opening statement of petitioner's attorney at the trial was similarly unenlightening, and, as previously stated, no brief was filed.

The evidence presented by petitioner adds nothing to clarify his contentions. In his own testimony he made no reference to this issue. The only evidence proffered on his behalf was the testimony of Gilliard M. Burden, a certified public accountant who, sometime after 1964, had examined petitioner's books and records for the period 1961–64. Burden testified that the amount of sales taxes shown on petitioner's Federal income tax return for 1964 was not taken from petitioner's records, but was computed under a formula approved by the State taxing authorities. He stated that under such formula one-third of the face amount of collections on installment obligations was excluded as being allocated to finance charges before the amount of sales taxes on such collections was calculated. He stated that the amount of $2,759.13 of taxes which the petitioner remitted in 1964 was based upon petitioner's cash sales and cash collections on installment notes during that year, but that petitioner did not remit all the sales taxes which had been collected. He also stated that sometime after 1964 the taxing authorities assessed a greater amount of sales taxes against petitioner for 1964 than the amount he had remitted in such year.

Petitioner offered no evidence whatever as to why he did not remit more of the sales taxes which he collected in 1964 than he did, or as to what he did with the excess amount. Moreover, there is no evidence as to how much more sales tax was assessed for such year or what further amount, if any, was thereafter remitted.

There appears to be no question that during 1964 the petitioner collected sales taxes in the amount of $13,930.27 as a part of his collections of installment payments in that year. He so reported in his Federal income tax return and the respondent so determined. It is

clear that under the Alabama statutes petitioner was under an obligation to pay over the taxes collected within 20 days after the closing of the month in which the collections were made, and that under Alabama law the taxes constituted a debt due the State and a lien against petitioner's property. However, the parties are agreed that in 1964 the petitioner remitted to the taxing authorities only $2,759.13 of the taxes collected by him in such year, and insofar as the record shows, no further amount of the taxes collected in 1964 has ever been remitted.

In *James* v. *United States*, 366 U.S. 213, the Supreme Court reviewed the broad question of when a taxpayer is required to include in his income receipts which he might later have to relinquish. There the Supreme Court stated in part:

The starting point in all cases dealing with the question of the scope of what is included in "gross income" begins with the basic premise that the purpose of Congress was "to use the full measure of its taxing power." *Helvering* v. *Clifford*, 309 U.S. 331, 334. And the Court has given a liberal construction to the broad phraseology of the "gross income" definition statutes in recognition of the intention of Congress to tax all gains except those specifically exempted. * * *

When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, "he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." *North American Oil* v. *Burnet, supra,* at p. 424. In such case, the taxpayer has "actual command over the property taxed—the actual benefit for which the tax is paid," *Corliss* v. *Bowers, supra.* This standard brings wrongful appropriations within the broad sweep of "gross income"; it excludes loans. When a law-abiding taxpayer mistakenly receives income in one year, which receipt is assailed and found to be invalid in a subsequent year, the taxpayer must nonetheless report the amount as "gross income" in the year received. *United States* v. *Lewis, supra; Healy* v. *Commissioner, supra.* We do not believe that Congress intended to treat a lawbreaking taxpayer differently.

As stated hereinabove, the petitioner has not informed us as to why he did not remit all the sales taxes which he collected in 1964. Nor has he contended that the unremitted portion should be viewed in a manner similar to a loan because of the liability imposed on him by State law to remit the same. Thus, whether he held such unremitted portion under some claim of right, or whether he held it with the intention of converting it to his own use in contravention of the provisions of the State law, we think it clear that he exercised command over it during 1964, had the actual benefit thereof, and hence must be considered to have been in receipt of taxable income to that extent. Accordingly, we approve the respondent's determination insofar as

680

he determined that the excess of the sales taxes collected by petitioner in 1964, namely, $13,930.27, over the amount thereof remitted by him in such year, $2,759.13, or $11,171.14, constituted taxable income to petitioner in 1964.[4]

On the other hand, we do not approve the respondent's determination that the petitioner was in receipt of taxable income in 1964 to the extent of $7,255.59, namely, the amount of sales taxes attributable to the unrealized installment payments remaining as of December 31, 1964, on notes which he had discounted to Mason Plan Co. during 1964. The Alabama statutes clearly provide that sales taxes with respect to credit sales accrue only as the collections of such credit sales are made. Therefore, only as petitioner made collections of the unrealized installment payments would he be considered as having collected the sales taxes with respect thereto, and only at that time would he become liable to remit the same to the taxing authorities. It is apparently true that, since the sales taxes were included in the face amounts of the installment notes, the petitioner received in 1964 an amount equivalent thereto when such notes were discounted to Mason Plan Co. However, as stated, only in years subsequent to 1964 as installment payments were made on such notes could such amount be considered as sales taxes collected by petitioner under the State law and only in such years would he be required to remit the same. We therefore cannot conclude that the amount of $7,255.59 constituted income to petitioner in 1964 on the ground that such amount represented unremitted sales taxes in that year as determined by the respondent.

*Decision will be entered under Rule 50.*

---

[4] In *White Bros. Co. v. Commissioner,* (C.A. 5), 180 F. 2d 451, affirming a Memorandum Opinion of this Court, it was held that the taxpayer was in receipt of taxable income in the amount of unremitted Louisiana sales taxes at the time the State lost its right to recover such unremitted taxes. No question was apparently raised in that case as to whether such unremitted taxes might have constituted income at some earlier time.

