J. BRYANT KASEY AND MARYANN KASEY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 62599. Filed January 11, 1960.

*Guy R. Crump, Esq.,* for the petitioners.
*Leo K. O'Brien, Esq.,* for the respondent.

#### OPINION.

RAUM, *Judge:* Respondent determined a deficiency in petitioners' income tax for the calendar year 1952, as follows:

| Year | Deficiency | Additions to tax, I.R.C. 1939 | |
| | | Sec. 294(d)(1)(A) | Sec. 294(d)(2) |
| --- | --- | --- | --- |
| 1952 | $2,488.54 | $356.77 | $356.77 |

The principal question is whether payments received by petitioners in 1952 as their share of net profits from the operation of certain mining claims should be treated as ordinary income subject to depletion, or as proceeds from the sale of a capital asset. The facts have been stipulated.

Petitioners, husband and wife, residing in Bakersfield, California, filed a joint income tax return for the calendar year 1952 with the district director of internal revenue at Los Angeles, California. The husband, J. Bryant Kasey, is a chemist and metallurgical engineer.

In 1951, petitioners acquired an undivided two-thirds interest in certain "primary" and "secondary" mining claims (hereinafter referred to as the San Bernardino claims) situated in the Clark Mountain Mining District in San Bernardino County, California; the remaining undivided one-third interest was acquired by Julius A. Paskan. Petitioners had recovered the tax basis of their interest in these claims prior to 1952, the taxable year involved herein.

Under date of June 11, 1951, petitioners and Paskan, designated as owners, entered into an agreement with Molybdenum Corporation of America (hereinafter referred to as Molybdenum) which recited

that petitioners and Paskan were the sole owners of the aforementioned mining claims, that they were willing to grant to Molybdenum an option to purchase those claims subject to the terms and conditions of the agreement, that Molybdenum desired to acquire such option, and that Molybdenum had theretofore acquired certain other mining claims in the same mining district (including the "Sulphide Queen" claims and the "Wash Queen" claims). Section First of the agreement provided that in consideration of $15,000 paid by Molybdenum to owners, Molybdenum was granted the exclusive option to purchase the claims, and all appurtenant rights and property on or before October 8, 1951, for a maximum purchase price of $2,000,000, payable as follows: Upon exercise of the option, Molybdenum was to pay owners $135,000 which, together with the initial payment of $15,000, would constitute an aggregate payment of $150,000 on account of the purchase price. The balance of the purchase price—$1,850,000—was payable, "if at all, only as, when and to the extent" that "royalties" became payable to owners as provided in section Fifth of the agreement. Section Fifth provided that if Molybdenum exercised the option and thereafter mined rare earth minerals from any primary claim which was valid on the date of exercise, Molybdenum would pay owners royalties on the rare earth content of the concentrates produced therefrom and shipped. Royalties were also payable on concentrates produced from minerals mined from any deposit or vein within both the Wash Queen claims and a valid primary claim but not within any of the Sulphide Queen claims. No royalties were payable with respect to concentrates produced from minerals mined within the perimeter of the Sulphide Queen claims, or from any deposit or vein of the Sulphide Queen claims. Royalty payments were set at 10 per cent of an amount computed as follows:

the average domestic market price per pound of rare earth content in monazite concentrates * * * multiplied by the number of pounds of rare earth content * * * of the rare earth concentrates shipped from the mine or mill during the quarterly period, less the sum of MOLYBDENUM'S total costs of mining and producing said concentrates and equalized shipping costs.

Royalties were to be similarly computed in the event Molybdenum produced any lead, barite, or fluorine from the primary claims; such minerals are not rare earth minerals. All obligations of Molybdenum to pay royalties on rare earth concentrates were to terminate when royalties had been paid with respect to rare earth ore aggregating 135,000 tons; and no further royalties, either on rare earth concentrates or the nonrare earth minerals, were payable when total royalties paid under the agreement amounted to $1,850,000. Royalties accrued quarterly and were payable within 30 days after the end of each quarterly period, one-third to Paskan and two-thirds to petitioners.

Section Fourth of the agreement provided that if Molybdenum, after exercise of the option, commenced commercial operations for the mining and production of rare earth minerals from any of the Sulphide Queen claims, it would also commence similar operations, if it had not already done so, within the Wash Queen claims with respect to which owners were entitled to royalties under the terms of the agreement, and would continue such operations "so long as the same shall in MOLYBDENUM judgment be economically feasible."

Section Seventh of the agreement provided that in the event the option was exercised, owners would admit the validity of the Sulphide Queen claims under the laws of the United States and the State of California, consent to a judgment quieting title to such claims in favor of the plaintiffs in a suit then pending in the Superior Court of the State of California brought by Fred B. Piehl, et al., plaintiffs, against J. Bryant Kasey, et al., defendants, and consent to a judgment in the same suit in favor of plaintiffs and cross-defendants as to a cross-complaint seeking to quiet title to certain of the aforementioned primary claims insofar as any such claim, or any secondary claim, conflicted with the Sulphide Queen claims.

Section Ninth provided that neither the execution of the agreement nor the exercise of the option would prejudice Molybdenum's right to assert in good faith the invalidity of any claim, or to exercise "full and complete rights of ownership" of the primary and secondary claims including, "without limitation, the right to determine whether it shall mine (excepting only as otherwise specifically provided in Section Fourth hereof), maintain or abandon" any claim, provided that abandonment and relocation of any primary claim "shall not relieve MOLYBDENUM from any obligation it might otherwise have to pay royalty under the provisions of Section Fifth."

In section Thirteenth, owners reserved the right, following the expiration of 3 years after exercise of the option, to mine and remove mica and nonrare earth minerals contained therein, radio-active materials and elements, and tungsten from certain specified claims.

On September 21, 1951, pursuant and subject to the terms of the June 11 agreement, petitioners and Paskan executed a deed conveying the San Bernardino claims, and appurtenant rights and properties, to Molybdenum. Prior to October 8, 1951, Molybdenum exercised its purchase option and paid the amount of $135,000 to petitioners and Paskan during 1951.

During 1952, petitioners received $37,128.34 from Molybdenum as their share of the royalties provided for in section Fifth of the agreement. On their tax return for 1952, petitioners reported these royalties as long-term capital gain, and respondent subsequently determined that they were ordinary income.

The controlling question is whether petitioners retained an economic interest in the San Bernardino claims, represented by their right to share in the net profits from production. The technical title to the minerals in place is not important; nor is it a matter of consequence whether, under State law, the transaction is properly characterized as a sale, lease, or otherwise. *Burnet* v. *Harmel*, 287 U.S. 103.

The present case closely resembles *Lincoln D. Godshall*, 13 T.C. 681, where the owner of mining rights contracted to lease them, receiving a downpayment of $11,000 and giving the "lessee" an "option to purchase." It placed in escrow a deed to the rights, to be delivered to the lessee after the "rentals" had reached an aggregate of $139,000. The "rentals" were measured by a percentage of net returns from mining operations. There, as here, the purchaser was not under any unconditional obligation to continue mining operations. It was held that the owner reserved an economic interest in the mining rights, with the consequence that the so-called rental payments were treated as ordinary income rather than capital gain. Bearing in mind the ruling of the Supreme Court in *Burnet* v. *Harmel*, *supra*, to the effect that the label placed upon the transaction as a "sale" or "lease" is not important, we find it difficult to perceive any significant difference between the present case and *Godshall*. We find that we must reach the same result here.

Petitioners rely heavily upon *Helvering* v. *Elbe Oil Land Development Co.*, 303 U.S. 372. But that case must be read in the light of the Supreme Court's later decision in *Burton-Sutton Oil Co.* v. *Commissioner*, 328 U.S. 59, which limited the scope of the *Elbe* decision, and which was relied upon by this Court in *Godshall*. The *Elbe* case is distinguishable here for the same reason that the Court found it inapposite in *Godshall*, *supra* at 685.

Petitioners stress the fact that in *Burton-Sutton* the operator was obligated to begin drilling within 30 days whereas in the present case Molybdenum acquired the right to determine whether it would mine. But the distinction urged upon us does not require a different result. In this regard, it should be noted that petitioners retained some measure of operating control in obligating Molybdenum to begin operations within the Wash Queen claims no later than the beginning of operations within the Sulphide Queen claims. And, in any event, the receipt of the payments in question clearly depended upon production, regardless of which party controlled the decision to produce.

Petitioners also point out that if Molybdenum mined only the Wash Queen claims, conceivably all of the net profits payments might come from that property, and none from any of petitioners' claims. Apart from the fact that this was unlikely and that the agreement

660

contemplated production generally, we agree with respondent that the effect of the agreement was to combine the interests of petitioners and the Wash Queen property, and petitioners actually acquired an interest in the Wash Queen claims which itself was contingent upon production therefrom.

This case is to be sharply distinguished from our recent decision in *Ima Mines Corporation*, 32 T.C. 1360, where the entire purchase price of $500,000 was payable absolutely, and the "only effect" of the net profits provision "was to hasten the time when the $500,000 obligation was satisfied." The opinion distinguished *Godshall* since the payments in that case "were payable solely out of the proceeds of mined ores"; in contrast, it was "unnecessary" that the taxpayer in *Ima Mines* "look to production for the return of any part of its capital investment."

In view of our opinion that petitioners retained an economic interest in the San Bernardino claims, it follows that the net profits payments flowing from such interest are properly regarded as ordinary income subject to depletion.

Petitioners have not pressed the issue raised by the pleadings with respect to their liability for self-employment tax determined by respondent, based upon a jewelry business allegedly conducted by one of the petitioners; accordingly, we hold that they are liable for such tax pursuant to section 481, I.R.C. 1939. Similarly, petitioners have not presented any evidence contesting the addition to tax under section 294(d)(1)(A), I.R.C. 1939, which must therefore be sustained; the addition to tax under section 294(d)(2), however, is disapproved on the authority of *Commissioner* v. *Acker*, 361 U.S. 87 (1959).

*Decision will be entered under Rule 50.*