Robert L. Mellen, Sr. and Irene Mellen v. Commissioner.
Mellen v. Commissioner
Docket Nos. 83763, 93483.
United States Tax Court
T.C. Memo 1963-89; 1963 Tax Ct. Memo LEXIS 252; 22 T.C.M. (CCH) 422; T.C.M. (RIA) 63089; March 28, 1963
Lester M. Ponder, Esq., 1313 Merchants Bldg., Indianapolis, Ind., for the petitioners. Clarence C. Roby, Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined the following deficiencies in income tax of petitioners: Taxable
Docket
Year
Deficiency
83763
1953
$3,102.45
1954
4,055.02
1955
4,769.22
1956
5,833.24
93483
1957
3,943.20
1958
3,536.53 [1]
Certain adjustments have been made and the only remaining question is whether certain payments constituted royalties or sale proceeds. Findings of Fact Some of the facts have been stipulated *253 and are so found. Petitioners in both dockets are Robert L. Mellen, Sr. (hereinafter referred to as Robert), and Irene Mellen (hereinafter referred to as Irene), husband and wife, and residents of Bedford, Indiana. Petitioners filed joint Federal income tax returns for the calendar years 1953 to 1959, inclusive, on the cash basis method with the district director of internal revenue at Indianapolis, Indiana. On November 6, 1945, Irene purchased two tracts of real estate located in Monroe County, Indiana, for $3,150 and $4,299.11 at a sheriff's sale, and the total of such amounts, $7,449.11, is her adjusted basis for such property. A stone quarry, known as the "Monarch Quarry,'" was situated on this real estate. On February 5, 1953, petitioners entered into an agreement captioned "Lease" with Midwest Quarries Company, Inc., (hereinafter referred to as Midwest). This agreement provided in part: That Lessor [petitioners] for and in consideration of One Dollar ($1.00) in hand paid by Lessee [Midwest] to Lessor, receipt of which is hereby acknowledged, and other considerations hereinafter mentioned, does hereby grant, demise and lease unto Lessee, its assigns and successors *254 for a period of Ten (10) years from the date of this agreement, the following described real estate: * * *
together with all railway tracks and all rights and title to any and all railroad tracks and switches on said above described real estate, together with the right to enter upon and quarry stone and remove the same from said land, to erect any and all necessary buildings on said premises, to erect derricks and place machinery needed in quarrying stone, to strip said land of earth and over burden for said quarrying, to pile the dirt and debris on said land, to stack and pile all refuse stone, culls and the like on said land to leave the same on the premises; and in general, to do everything necessary in opening and operating a stone quarry or quarries and stone mill on said described real estate. It is further agreed that as a consideration of this contract Lessee is to pay Lessor as a royalty the sum of Five Cents ($.05) per cubic foot for every cubic foot of marketable stone removed from said land and sold by Lessee. In this connection, it is agreed by the parties, that the marketable stone on which Lessee shall make said payment is that part of each block which it shall *255 sell. It is further mutually agreed between the parties hereto that the total royalties for the first five (5) years of the said ten (10) year term herein shall not be less than Twenty-five Thousand Dollars ($25,000.00); and until such time as the said Twenty-five Thousand Dollars ($25,000.00) shall have been paid, the minimum annual royalties for each of the first five (5) years shall be Five Thousand Dollars ($5,000.00); and that there shall be no minimum amount of royalties during the remainder of said above term and that during said last five (5) year period royalties shall be paid as herein provided and at the above rate of $.05 per cubic foot, and that any and all of such payments shall be applied upon the purchase price as provided in the last paragraph of this contract. All of said payments shall be made within thirty (30) days following the immediately preceding quarterly period to Lessor at a place she shall designate. Lessor covenants that she is the owner of the real estate above described; that there are no liens, encumbrances or clouds upon her title except current taxes, none delinquent; and that Lessee upon performance of all the terms and conditions by it to be performed, *256 shall have the full right to the peaceable and quiet possession and occupancy thereof. * * *
It is further agreed that Lessee shall have and Lessor hereby grants to Lessee, the excluse [sic] right during the term hereof to purchase, the premises herein described for the sum of Fifty Thousand Dollars ($50,000.00). Should Lessee elect to exercise this right, it is agreed that all payments as aforesaid shall apply against said purchase price. In furtherance of this agreement, Lessor agrees to deposit with The Citizens Bank and Trust Company of Bloomington, Indiana, as escrow agent, a duly executed warranty deed conveying said real estate, free and clear of all liens and encumbrances excepting those resulting from Lessee's occupancy of the premises, to Lessee together with an abstract of title showing a merchantable title in fee simple in Lessor to be delivered by said escrow agent to Lessee upon its furnishing the escrow agent cancelled checks evidencing payment to Lessor, her heirs, executors, administrators or assigns, of the sum of Fifty Thousand Dollars ($50,000.00) under the royalty payments herein provided or receipts for said payments and a certified check for the difference *257 between said purchase price and the total of such royalty payments. Irene received the following payments from Midwest pursuant to the agreement of February 5, 1953. 5/15/53
$ 1,076.55
10/13/53
1,109.98
1/26/54
2,813.47
4/15/54
1,251.63
7/23/54
1,812.97
10/21/54
2,571.31
1/25/55
2,408.95
4/29/55
815.70
7/20/55
2,154.95
10/24/55
3,022.16
1/20/56
2,971.08
4/26/56
1,834.30
7/27/56
1,558.17
10/19/56
3,163.28
1/18/57
2,951.76
4/26/57
1,433.43
7/27/57
1,085.36
10/30/57
1,997.88
1/31/58
2,222.04
4/23/58
2,000.35
7/31/58
1,255.88
10/30/58
1,252.67
1/30/59
1,688.51
4/30/59
1,731.54
7/31/59
1,076.94
10/16/59
2,739.14
Total amount paid
$50,000.00
On or about February 5, 1953, petitioners deposited with The Citizens Bank and Trust Company of Bloomington, Indiana, as escrow agent, an executed warranty deed with respect to the two tracts of real estate described above, together with an abstract of title showing a merchantable title in fee simple in petitioners. On October 20, 1959, after delivery of a certified check in the amount of $2,739.14, making an aggregate payment of $50,000, such warranty deed and abstract of title *258 were delivered to Midwest by the escrow agent and the deed recorded with the recorder of Monroe County, Indiana. Soon after February 5, 1953, Midwest moved its equipment on to the property covered by the agreement. Midwest then paid the Monon Railroad to put a short spur past the loading derrick. Midwest also paid the real estate taxes on the property. In 1959, petitioners reported as long-term capital gain $50,000, less basis, for the quarry property. Petitioners now concede that if the assertion of capital gain treatment is sustained, the payments should first be applied against their basis and then should be treated as capital gains in each year of receipt. Respondent avers that the payments made during the years 1953 through 1958 [2] were not capital gains but were royalties taxable as ordinary income. The relevant payments received by petitioners from Midwest constituted ordinary royalty income and were not proceeds from the sale of a capital asset. Opinion Petitioners argue that they had no economic interest in the quarry after the February 5, 1953, agreement became operative, and are therefore entitled to treat the "royalties" *259 as sale proceeds. We have held that if a purported seller of a mineral interest has rights to receive payment only out of the minerals produced or the net proceeds of production, he has retained an economic interest in the minerals, therefore cannot have sold them, and that the royalties or rental payments are to be treated as ordinary income rather than as capital gain. Lincoln D. Godshall, 13 T.C. 681 (1949); J. Bryant Kasey, 33 T.C. 656 (1960). On the other hand, if the purported seller is entitled to the purchase price regardless of production, then he has made a sale and not retained any economic interest. Ima Mines Corporation, 32 T.C. 1360 (1959). The instant case is within the scope of the Godshall and Kasey decisions. In Godshall we found ordinary income treatment rather than sale where there was a lease of mining rights with an option to purchase, but with lessee's obligation for payment of the option price wholly dependent upon ores actually mined. In Kasey we found ordinary income treatment where owners of mining claims transferred their claims for a fixed payment plus certain amounts payable out of net profits from production. *260 The instant case is unlike Ima Mines Corporation, supra, at page 1367, since the payments there "were fixed and were wholly unrelated to production." In Ima Mines the agreed purchase price (after certain credits) was $380,000 payable at the rate of $25,000 per year. These payments were fixed and were wholly unrelated to production. Annual payments on the total purchase price over and above the $25,000 per year were required to be made only in the event that net returns from metals, minerals, etc. exceeded $400,000 in any one year and then at the rate of 5 percent on such excess. We held that this transaction amounted to a sale since the additional excess-production payments, if any, would merely hasten the payment of the total agreed price. As we stated in Kasey, supra, Ima Mines is to be "sharply distinguished" on its facts from that case and from Godshall, supra. Both Godshall and Kasey rested on the ground that the transferor retained an economic interest in the relevant property. Similarly, the petitioners here retained an economic interest. Midwest chose not to bind itself for $50,000 at the outset. The 10-year lease provided for a minimum *261 yearly payment of $5,000 for only the first 5 years. [3] Thereafter, obligation for payments would be based solely on the "royalty" of 5 cents per cubic foot of removed marketable stone. There was no other fixed liability, and if nothing further was mined, nothing further need be paid. If there was an election to purchase and if a total of $50,000 was paid, then and only then, would the transferors' economic interest in the relevant property cease. Petitioners argue that they did not look solely to production for payment, since Midwest could have paid the purchase price without quarrying stone. Yet Midwest was under no obligation to purchase, and it seems that the entire $50,000 was in fact paid under the contract "royalty" formula. In any event, petitioners have not proved and do not argue otherwise. It is clear, viewing the record as a whole, that petitioners retained an economic interest. We therefore sustain respondent on this issue. Decisions will be entered under Rule 50. Footnotes
1. The determined deficiency is $3,552.31, but petitioners were credited for an overpayment under section 6654(a) in the amount of $15.78.↩
2. The year 1959 is not before us.↩
3. Petitioners do not urge any different treatment of this $25,000 in "guaranteed" or minimum payments, and we do not believe any is justified.↩