JOSEPH J. STRUTZEL, JR., AND JUSTINE W. STRUTZEL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

MARK T. AND LOUISE D. MILLER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6449–69, 6450–69. Filed September 25, 1973.

*Lee M. Galloway*, for the petitioners.
*Edward B. Simpson*, for the respondent.

DRENNEN, *Judge:\** Respondent determined deficiencies in Federal income taxes of petitioners for the designated years in the following amounts:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 6449–69 | Joseph J. Strutzel, Jr., and Justine W. Strutzel | 1966 | $1,408.00 |
| | | 1967 | 1,200.00 |
| | | 1968 | 1,573.86 |
| 6450–69 | Mark T. Miller and Louise D. Miller | 1966 | 854.14 |
| | | 1967 | 753.37 |

\*Pursuant to a notice of reassignment sent to counsel for all parties, and to which no objections were filed, these cases were reassigned by the Chief Judge on Aug. 7, 1973, from Judge Austin Hoyt to Judge W. M. Drennen for disposition.

The cases were consolidated on a joint motion of all the parties because of their common issues of law and fact. Prior to trial petitioners Mark and Louise Miller consented to a settlement of one issue, and petitioners Joseph and Justine Strutzel conceded that their allowable medical expense deductions are dependent on our decision with respect to the primary issue at bar. That issue is whether an agreement between petitioners and a mining company constituted a sale of their interests in certain unpatented mining claims, thus producing capital gain, or a lease, thus producing ordinary income subject to a depletion allowance.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

Petitioners Joseph J. Strutzel, Jr., and Justine W. Strutzel are husband and wife and maintained their residence in Phoenix, Ariz., when the petition herein was filed. They filed their joint income tax returns for the taxable years 1966, 1967, and 1968 with the district director of internal revenue, Phoenix, Ariz.

Petitioners Mark T. and Louise D. Miller are husband and wife and resided in Greenville, Calif., at the time they filed the petition in this case. Their joint original and amended income tax returns for the taxable year 1966 and their original return for 1967 were filed with the district director of internal revenue, San Francisco, Calif.

In 1964 and 1965 petitioners Mark T. Miller and Joseph Strutzel filed and recorded 14 unpatented mining claims located in the Moonlight Valley area of the Lights Creek District in Plumas County, Calif. Strutzel's basis in the claims for purposes of computing capital gain or loss is $3,499. No other amounts represent basis to any of the petitioners.

On November 15, 1966, petitioners executed an agreement with the American Exploration and Mining Co. (Amex) entitled "Mining Lease and Option to Purchase." The relevant parts of the terms of the agreement are either quoted or paraphrased below:[1]

1. GRANT OF LEASE. Lessor [petitioners] hereby leases the property * * * to Lessee and further grants Lessee the following rights with respect to the property.
    A. The sole and exclusive possession thereof during the term of this Lease.
    B. The right to conduct mining operations thereon, including exploration, development and production, and removal of ore and by-products therefrom.
    C. All rights reasonably incident to the furtherance of the above rights.
2. DESCRIPTION OF PROPERTY. The property which forms the subject of this agreement is those fourteen (14) unpatented lode mining claims in the Moonlight Valley District, Plumas County, California * * *
3. TERM OF LEASE. This lease shall begin on the date it is executed and shall continue to December 1, 1976.

---

[1] The agreement was prepared by attorneys for Amex.

4. MINIMUM ADVANCE ROYALTY. Provided this lease is then in effect, Lessee shall pay the Lessor the following schedule of minimum advance royalties:

\* \* \* \* \* \* \*

[The schedule requires payment of $25,000 on execution of the lease, $25,000 on December 1, 1967; and $25,000 plus an additional $5,000 for each year thereafter on December 1 of each year, concluding with a payment of $70,000 on December 1, 1976, the total of which was $500,000.]

All minimum advance royalty payments shall be set off against and used to reduce later accruing production royalty payments.

5. PRODUCTION ROYALTY. Lessee shall pay Lessor a production royalty equal to 5% of net smelter returns on all ore mined and concentrated (or shipped directly to a smelter).

\* \* \* \* \* \* \*

Nothing herein contained shall in any way diminish Lessee's exclusive right to determine when, whether, where, and how, ore shall be produced and sold.

6. FURTHER OBLIGATIONS OF LESSEE. [Among other things, Lessee agreed to conduct its operations in workmanlike manner, pay all property taxes, perform assessment work necessary to maintain the claims in good standing, not to cause liens to arise against the property except for liens resulting from O.M.E. or similar loans, and arising in connection with financing of equipping the property for production, to save Lessor harmless against claims arising from injury to persons or damage to property, and to keep accurate records of all ore mined, etc.]

\* \* \* \* \* \* \*

9. OPTION TO PURCHASE. Amex is hereby granted an option exercisable at any time during the term of this lease to purchase the property for the purchase price of Five Hundred Thousand Dollars ($500,000.00) minus all royalty payments (Whether minimum royalties or production royalties) theretofor paid.

\* \* \* \* \* \* \*

[Both parties to deposit with Escrow Agent grant or quitclaim deeds to be delivered to other party upon exercise of the option to purchase or termination without exercise of the option.]

10. TERMINATION OF LEASE BY AMEX. Amex may, at any time, upon thirty (30) days' written notice, terminate this Lease and be under no further obligation to Lessor except that: \* \* \*

Pursuant to the agreement petitioners deposited a grant deed to the claims with the designated escrow agent. Their wives and Amex deposited quitclaim deeds with the escrow agent.

From the time of the execution of the agreement to the date of trial Amex conducted test borings and exploratory activities on the claims acquired from petitioners, along with other claims in the same area acquired prior to the agreement, but no minerals were extracted in marketable quantities. As of March 1, 1971, Amex had expended $3,782,989 in exploration of its Lights Creek claims, including approximately $445,000 spent on the claims acquired from petitioners.

At the time of the trial Amex had exercised neither the option to purchase nor the right of termination granted by the agreement.

Petitioners received from Amex all "minimum advance royalties"

required by the agreement to the date of trial. No production royalties were paid. For the tax years in question petitioners received the following amounts: [2]

| Year | Strutzels | Millers |
|------|-----------|---------|
| 1966 | $12, 500. 00 | $12, 500 |
| 1967 | 12, 484. 38 | 12, 500 |
| 1968 | 14, 981. 00 | |

The Strutzels reported all income under the agreement as gain from the sale of a capital asset held for more than 6 months. The Millers reported the 1966 payment as ordinary income, but filed an amended return characterizing it as capital gain. The 1967 payment was reported by the Millers as capital gain in their original return for that year.

In the notices of deficiency respondent determined that the amounts received by petitioners under the agreement were royalty income rather than gain from the sale of capital assets. Respondent also allowed a depletion deduction based on the royalty income.

### OPINION

The primary issue is whether the moneys received by petitioners from Amex during the years involved pursuant to the agreement dated November 15, 1966, were proceeds from the sale of capital assets or were ordinary income received under a lease agreement. The central question upon which disposition of that issue must rest is whether, under the terms of the agreement, petitioners retained an economic interest in the minerals in place.[3]

The concept of economic interest originated in the case of *Palmer* v. *Bender*, 287 U.S. 551 (1933), in which the Supreme Court considered the proper application of the mineral depletion allowance. An economic interest sufficient to justify the allowance has been held to exist where a taxpayer has:

(1) "acquired, by investment, any interest in * * * [the minerals] in place," and (2) secured by legal relationship "income derived from the extraction of * * * [the minerals], to which he must look for a return of his capital." * * * [*Commissioner* v. *Southwest Expl. Co.*, 350 U.S. 308, 314 (1956).]

It is settled that the economic interest test, as developed in the depletion cases, may also be applied to determine whether the proceeds derived from the disposition of mineral properties are eligible for

[2] There is no explanation why the Strutzels received slightly less than one-half of the annual fixed payments due under the agreement for 1967 and 1968. The year 1968 is not before the Court in the Miller case.

[3] It is not clear from the record what minerals were expected to be found in the mining claims but there is a suggestion that it was copper.

capital gains treatment.[4] See *Anderson* v. *Helvering*, 310 U.S. 404, 407–408 (1940); *Wood* v. *United States*, 377 F. 2d 300, 305 (C.A. 5, 1967). Hence, if an economic interest, as described above, has not been retained in the transfer of a mineral claim or property, which was a capital asset in the hands of the transferor, the proceeds of the transaction are capital gain rather than ordinary income, subject to depletion, to the transferor. The legal effect of the transfer agreement, for tax purposes, is controlled by its substance rather than its form. Its "essence is determined not by subtleties of draftsmanship but by their [its] total effect." *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260, 266–267 (1958). The substance of the agreement, for tax purposes, is determined not only by the language employed by the parties, but also by the purpose sought to be accomplished and the surrounding circumstances. *Gregory* v. *Helvering*, 293 U.S. 465 (1935); *Ollie G. Rose*, 56 T.C. 185 (1971). The legal effect of the agreement under State law is not controlling. *Burnet* v. *Harmel*, 287 U.S. 103 (1932); *J. Bryant Kasey*, 33 T.C. 656 (1960).

An analysis of the agreement between petitioners and Amex in the light of the above considerations convinces us that petitioners did not retain an economic interest in the mining claims transferred and consequently the profits they realized from the payments received under the agreement during the years here involved are taxable as capital gains, and we so hold.

It is true that the agreement was entitled "Mining Lease and Option to Purchase" and that the terms "lease," "lessor," and "lessee" are used throughout the instrument. But what the provisions of the agreement actually accomplished was to place complete control of the mining claims in Amex while the agreement was in effect, and to divest petitioners of all economic interest in the properties. The term of the lease was from the date of execution, November 15, 1966, to December 1, 1976. Petitioners had no right to cancel the agreement except for nonperformance on the part of Amex. Most importantly Amex was to pay petitioners as consideration for the transfer a fixed amount each year, starting at $25,000 the first year and increasing by $5,000 each year thereafter regardless of production. Amex had the option to purchase the mining claims for $500,000 at any time during the term of the lease and the total of the fixed payments called for in the agreement as of the termination date was also $500,000. The property was not productive when the agreement was executed and Amex was given sole and exclusive possession of the property during the term of the lease with the right to conduct mining operations

---

[4] We do not believe this is intended to be the exclusive test. We assume the owner of mineral property could lease the property without looking to production to pay the rent, although this would be unusual in a lease of mineral properties.

thereon, but Amex was given the exclusive right to determine when, whether, where, and how the ore should be produced and sold. Amex was not required to produce any ore and in fact was not even required to start exploration or any operations with respect to the claims. Amex was required to pay a production royalty of 5 percent of net smelter returns on any ore that was produced but the fixed annual payments were to be set off against and used to reduce any production royalties that might be called for. And both the fixed payments and any production royalties paid were to be applied against the purchase price. In addition Amex agreed to pay all property taxes, to perform all assessment work necessary to maintain the claims, to provide workmen's compensation and insurance against injuries to persons and damage to property, and could also permit liens to arise against the property resulting from loans from the Office of Minerals Exploration and for financing the equipment required to produce the ore.

It should be clear from the above analysis of the terms of the agreement that petitioners transferred all their rights in the mining claims to Amex during the term of the agreement and Amex assumed all of the rights and responsibilities of full ownership. Petitioners could not require Amex to explore or operate the property; Amex only had to do enough to keep the claims alive. Petitioners could not terminate the agreement as long as Amex paid the "minimum royalties." It is also evident that unless and until Amex's exploratory work on the claims proved them to be of little or no value so that it would cancel the agreement and return the property to petitioners, all payments made would be applied on the purchase price of the property. Until Amex canceled the agreement it was required to make annual payments which in time would equal the purchase price and it is reasonable to assume that when Amex had paid the full amount of the purchase price it would exercise its option to purchase. Petitioners had no control over whether the property was operated to produce; however, they were not dependent on production for payment of the "minimum royalties." Production royalties, if paid, would only serve to accelerate payment of the total purchase price. *Ima Mines Corporation*, 32 T.C. 1360 (1959). If Amex canceled the agreement and returned the property to petitioners it would indicate that there was no ore under the claims that could be mined at a profit. The provision for a reverter to petitioners if the agreement was canceled or if Amex failed to perform under it did not reserve for petitioners an economic interest in the property. *Crowell Land & Min. Corp.* v. *Commissioner*, 242 F. 2d 864 (C.A. 5, 1957).

Petitioners rely heavily on this Court's opinion in *Ima Mines Corporation, supra*. In that case, as here the taxpayer granted a mining

corporation the exclusive option to purchase its mining claims for a fixed purchase price, payment to be made in the form of annual fixed payments supplemented by production royalties if production of minerals from the claims exceeded a specified amount. Both the fixed payments and production royalties were duly paid, but the full purchase price had not been paid at the time of trial. This Court held that the transaction was a sale, since the vendor had retained no economic interest in the minerals in place and it was "unnecessary that petitioner look to production for the return of any part of its capital investment." *Ima Mines Corp., supra* at 1367. The same may be said of the case at bar. That it was unnecessary for petitioners to look to production for a return of their capital is demonstrated in practice by the fact that the required fixed payments were made by Amex despite the absence of any production. As in *Ima* the vendee accepted the usual incidents of ownership, including payment of taxes and assumption of the annual assessment obligation, and petitioners delivered a grant deed in escrow to await completion of the agreement. No amount of production could alter the total purchase price, but, as in *Ima*, could merely accelerate its payment. We can find no distinctions between this case and *Ima* that would call for a different result.

Respondent, on the other hand, relies on *Lincoln D. Godshall*, 13 T.C. 681 (1949), and *J. Bryant Kasey, supra*, wherein this Court found lease-option agreements to be leases rather than sales. Those cases and the other cases relied on by respondent are distinguishable from this case and *Ima* in one most important aspect; in those cases the transferors could look only to production royalties for a return on their investments, thus retaining a economic interest in the properties. In this case none of the payments received by petitioners during the years involved was "income from the extraction of" minerals.

Respondent argues further that under the rule enunciated in *Commissioner* v. *Danielson*, 378 F. 2d 771 (C.A. 3, 1967), petitioners are bound by the language used in the agreement with Amex, which is couched in terms normally associated with a lease. He argues that the *Danielson* rule has been adopted by the Ninth Circuit in *Clark* v. *United States*, 341 F. 2d 691 (C.A. 9, 1965), and *Nance* v. *United States*, 430 F. 2d 662 (C.A. 9, 1970), and, that being the circuit court to which an appeal in this case would normally lie, under *Jack E. Golsen*, 54 T.C. 742 (1970), this Court is obliged to follow the rule of that circuit court. Respondent argues further that even if the *Danielson* rule is not applicable, the "strong proof" rule usually applied by this Court, *Edmond E. Maseeh*, 52 T.C. 18 (1969), is applicable which would not permit petitioners to vary the terms of their

written agreement unless strong proof is adduced showing that a different result from that specified in the agreement was intended. *Ullman* v. *Commissioner*, 264 F. 2d 305 (C.A. 2, 1959). The short answer to both of the above arguments is that neither the petitioners nor this Court is attempting to vary the terms of the written agreement; we are simply trying to determine the tax consequences that flow from the agreement entered into by the parties. In doing so we are not bound by the descriptive terminology used in the agreement if the clear substantive purport of the agreement, viewed as a whole, classifies the transaction differently than the labels used by the draftsman. *Commissioner* v. *P. G. Lake, Inc., supra.* The substance of the transaction rather than the form of the agreement must determine the tax consequences to the parties.[5] *Commissioner* v. *P. G. Lake, Inc., supra; Wood* v. *United States, supra; Arthur S. Barker, supra.* We find that the effect of the agreement between the parties, for tax purposes at least, was a relinquishment by petitioners of all economic interest in the mining claims and thus was a sale of a capital asset.

Finally, respondent urges that should we find that petitioners retained an economic interest in the minerals in place, but that the payments to petitioners did not represent minimum advance royalties, that we hold the payments to be consideration paid for the anticipatory assignment of depletable income under the theory of *Commissioner* v. *P. G. Lake, Inc., supra.* Since we have held that petitioners did not retain an economic interest, it is unnecessary for us to rule on this somewhat abstruse contention. In any event, it is difficult to conceive of a situation in which the transfer of an interest in a nonproductive mineral claim could constitute an assignment of income under the principles of the *P. G. Lake, Inc.* case. Under the agreement petitioners transferred the income-producing property as well as the income therefrom, hence *Lake* does not apply.

We hold for petitioners on the issue presented for decision. To reflect concessions made by petitioners in docket No. 6450–69,

> *Decision will be entered under Rule 50 in docket No. 6450–69.*
>
> *Decision will be entered for the petitioners in docket No. 6449–69.*

---

[5] The agreement was prepared by representatives of Amex. Petitioners testified that they intended the transaction to be a sale which would guarantee payments regardless of production. A representative of Amex who was called as a witness did not refute petitioners' testimony.