WATTS COPY SYSTEMS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Watts Copy Sys. v. Commissioner
Docket Nos. 20676-91, 4910-92
United States Tax Court
T.C. Memo 1994-124; 1994 Tax Ct. Memo LEXIS 132; 67 T.C.M. (CCH) 2480; March 28, 1994, Filed *132 Decision will be entered under Rule 155. For petitioner: Albert L. Grasso, John P. Fadden, and Steven B. Wolf. For respondent: Michael W. Bitner. SWIFT
SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: In two notices of deficiency dated June 12 and December 6, 1991, respondent determined deficiencies in petitioner's corporate Federal income taxes as follows: Year
Deficiency
1986
$ 131,706
1987
87,616
1988
494
1989
1,552
All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. After settlement of some issues, the issue for decision is whether petitioner received, in consideration for the assignment of certain rights under equipment leases, nontaxable loan proceeds or taxable sales proceeds. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioner was incorporated in the State of Illinois. At the time the petition was filed, petitioner's principal place of business was in Springfield, Illinois. During 1986 through 1989, petitioner's business involved the sale and leasing of office equipment. The leasing of office *133 equipment involved approximately 60 to 65 percent of petitioner's business. In leasing office equipment, petitioner and the lessees used a standard equipment lease agreement containing a description of the equipment to be leased, the lease term, and the amount of the monthly lease payments that were due. The lease agreement obligated the lessees to obtain insurance on the equipment and to name petitioner as loss payee. At the end of the lease term, petitioner would retake possession of the equipment from the lessees, and petitioner would either re-lease or sell the equipment. Prior to 1985, petitioner funded the operation and capital costs of its leasing business through internal funds and commercial bank loans. On August 20, 1985, Norwest Financial Leasing, Inc. (Norwest), offered to provide funding to petitioner in connection with petitioner's office equipment leasing business. Norwest is a subsidiary of Norwest Financial, Inc., a subsidiary of Norwest Corp., a regional bank holding company headquartered in Minneapolis, Minnesota. Norwest specialized in providing funds to equipment lessors and in managing the billing and collection activities associated with the leases. *134 In consideration for the receipt of funds from Norwest, equipment lessors would assign to Norwest the lease payments that were due under end-user lease agreements. The amount of funds provided by Norwest to equipment lessors with regard to the leases of particular equipment would reflect a discounted present value calculation of the total lease payments due under the leases. For the years before us, the interest rate used by Norwest in this calculation was between 17 and 21 percent. On August 22, 1985, petitioner and Norwest entered into agreements entitled "Master Assignment of Equipment Rental Agreements" and "Addendum II" (collectively referred to as the Master Assignment), under which Norwest agreed to provide funds to petitioner and petitioner agreed to assign to Norwest, as consideration for and in repayment of the funds received from Norwest, the right to receive the lease payments due under the related equipment leases. In the Master Assignment, petitioner and Norwest repeatedly used the terms "sale" and "purchase" to describe generally petitioner's assignment to Norwest of certain rights under the leases, as illustrated in the following excerpt therefrom: [Petitioner] *135 proposes from time to time to sell and assign its rights but not its obligations under certain equipment rental agreements ("Leases") to Norwest and Norwest proposes from time to time to purchase and receive certain Leases from [petitioner]. * * *
The Master Assignment expressly stated that funds provided by Norwest did "not include and [were] not payment for title to the property covered by and described in the Leases assigned." Petitioner was obligated to transfer to Norwest a security interest in the equipment covered by each lease, to maintain insurance on the equipment, to pay all taxes on the leases and on the equipment, and to indemnify Norwest for any claims involving petitioner's obligations or liabilities under the leases. When petitioner used Norwest as a source of funds for particular lease transactions, upon entering into the equipment leases with the lessees, petitioner would submit the lessees' credit applications to Norwest for approval. If Norwest approved the lessees' credit, Norwest would compute the amount of the up front funds it would provide to petitioner in connection with an assignment of petitioner's rights to receive the remaining lease payments or *136 income stream due under the leases. The amount of the funds that Norwest would provide to petitioner would be computed according to Norwest's Standard Buy Rate Chart, and, as indicated, the amount would reflect a discount or interest rate of between 17 and 21 percent. The funds provided by Norwest to petitioner would then be used by petitioner to pay for petitioner's purchase of office equipment. All monthly billings with respect to leases assigned by petitioner to Norwest would be mailed in petitioner's name by Norwest, and monthly lease payments made payable to petitioner would be sent by the lessees to a post office box in Des Moines, Iowa, controlled by Norwest. The payments would be endorsed by Norwest employees who had authority to sign petitioner's name, and the payments would be deposited in a bank account nominally in petitioner's name but owned by Norwest. When a lessee became delinquent in making payments, Norwest, in petitioner's name, would make telephone calls and would mail delinquency notices to the lessees. If payments due under a lease that had been assigned to Norwest became delinquent, or if petitioner broke any of the warranties described in the Master Assignment, *137 at the option of Norwest, petitioner would be obligated to accept from Norwest a reassignment of the rights Norwest had received under any lease and to reimburse Norwest for any resulting costs and damages. Petitioner also would be required to repay Norwest a pro rata portion of the funds Norwest had provided to petitioner reflecting the amount of the remaining lease payments due. Under every lease assigned to Norwest, petitioner remained liable on a recourse basis for the total amount due Norwest. After the lessees had made all payments due on the leases that had been assigned to Norwest, Norwest would relinquish its security interests in the equipment covered by the leases. If Norwest rejected a lessee's credit application, petitioner would finance the purchase of the office equipment with internal funds or with a commercial bank loan. Although these terms were not mentioned in the Master Assignment, Norwest would require petitioner to periodically provide it with financial statements, and petitioner was permitted at any time and for any reason to designate any lease for reassignment from Norwest back to petitioner. Norwest did not participate in the repossession, remarketing, *138 or resale of any equipment. During 1986 through 1989, petitioner was required to accept a reassignment from Norwest of five defaulted leases. Petitioner was not liable for any penalties or interest on the defaulted leases. During 1986 through 1989, even though the discount or interest rate charged by Norwest was higher than bank interest rates, petitioner used Norwest as a source of financing part of its equipment leasing business because petitioner's credit with commercial banks was limited. Norwest also offered petitioner and other equipment leasing companies the option of financing equipment leasing transactions through Norwest using a traditional loan format with promissory notes and security agreements. Under typical loan agreements petitioner entered into with commercial banks during 1986 through 1989 to finance portions of its leasing business, petitioner would execute promissory notes, and petitioner would grant the banks a security interest in the leased equipment. The loan documentation between petitioner and the commercial banks typically would contain language similar to that used in the Master Assignment between petitioner and Norwest making reference to a "sale" *139 and "purchase". Under such loan agreements, the lessees typically would not be notified of the banks' involvement, and the lessees would make payments directly to petitioner. The following chart reflects the sources and the amounts of capital funds used by petitioner in its equipment leasing business during 1986 through 1989: Year
Internal Funds
Bank Funds
Norwest Funds
1986
$ 457,970
$ 113,935
$ 356,285
1987
498,994
340,606
443,957
1988
629,588
429,154
495,302
1989
737,505
382,791
528,098
During 1986 through 1989, at the time petitioner purchased office equipment, petitioner would reflect on its books and records the purchased equipment as inventory. When petitioner leased office equipment to its customers, journal entries would be made on petitioner's books and records to transfer the equipment from inventory to a fixed asset account. When petitioner received funds from Norwest and assigned to Norwest its right to receive lease payments due under the leases of office equipment, the receipt of the funds from Norwest would be accounted for on petitioner's books as a debit to cash and as a credit to deferred revenue. Each month, as payments were received *140 from the lessees and transferred to Norwest, the amounts received were accounted for on petitioner's books as a debit to deferred revenue and as a credit to rental income. For Federal income tax reporting purposes, funds received by petitioner from Norwest with respect to assignments made under the Master Assignment were treated by petitioner as nontaxable loans (i.e., as deferred or unearned revenue). As the lease payments were received from the lessees, the related lease payments were reported as taxable income (i.e., as earned revenue). Throughout the period at issue, petitioner was consistent in its treatment of the transactions for financial accounting and for Federal income tax purposes. Norwest, for both financial accounting and Federal income tax reporting purposes, treated the transactions with petitioner and with other equipment leasing companies under the Master Assignment format in the same manner as it treated transactions using promissory notes and security agreements, i.e., as loan transactions, and the funds received from the lessees as payments of principal and interest on loans. On audit, respondent determined that under the terms of the Master Assignment, petitioner *141 entered into taxable sales transactions with Norwest and, therefore, that petitioner should have reported as taxable income, upon receipt, all funds received from Norwest by petitioner. OPINION In deciding, for Federal income tax purposes, whether transactions constitute nontaxable loans or taxable sales, the economic substance of the transactions governs. Helvering v. F. & R. Lazarus & Co., 308 U.S. 252 (1939). The term "sale" is given its ordinary meaning and is generally defined as a transfer of the ownership of property for money or for a promise to pay money. Commissioner v. Brown, 380 U.S. 563, 570-571 (1965). The use of "purchase" and "sale" language in an agreement does not govern for Federal income tax purposes if the form or substance of the transaction viewed as a whole indicates that the transaction, in fact, constituted a loan. Mapco Inc. v. United States, 214 Ct. Cl. 389, 556 F.2d 1107, 1109-1110 (1977); Illinois Power Co. v. Commissioner, 87 T.C. 1417, 1432-1436 (1986); Gatlin v. Commissioner, 34 B.T.A. 50, 53 (1936); *142 Coulter Electronics, Inc. v. Commissioner, T.C. Memo. 1990-186, affd. without published opinion 943 F.2d 1318 (11th Cir. 1991). As has been stated, "the distinction is narrow between selling a property right to future income and assigning anticipated income as collateral to secure financing." Mapco Inc. v. United States, supra at 1110. The key to deciding whether such transactions should be treated as sales is to determine whether the benefits and burdens of ownership of substantial property interests were transferred between the parties. Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981). This is a question of fact that must be ascertained from the intent of the parties as evidenced by the written agreements read in light of all the surrounding facts and circumstances. Id. Some of the factors that courts consider in deciding whether the benefits and burdens of ownership of property have been transferred are: (1) Whether legal title was transferred; (2) how the parties treated the transaction; (3) whether an equity interest was acquired in the property; (4) *143 which party paid the property taxes; (5) which party bore the risk of loss or damage to the property; and (6) which party is entitled to the profits from any subsequent use, operation, or sale of the property. Id. at 1237-1238, and cases cited therein; see also United Surgical Steel Co. v. Commissioner, 54 T.C. 1215, 1220-1221, 1227-1231 (1970). Respondent contends that, under the Master Assignment, the assignment by petitioner to Norwest of the right to receive lease payments and the receipt by petitioner of funds from Norwest constituted sales and not secured loans. To the contrary, petitioner contends that the right to receive the lease payments was assigned to Norwest only as a method of securing repayment to Norwest of the funds loaned to petitioner. In Technical Advice Memorandum (TAM) 8643002 (June 20, 1986), respondent concluded that, under facts substantially similar to those present in this case, the transactions were to be treated as loans, not as sales of the lease payments anticipated under the leases. The key factors upon which respondent based this conclusion were: (1) The collateral securing repayment *144 of the amounts due was not limited to the lease payments due but included the equipment itself; and (2) the institution providing funds was shielded from the risk of loss by the lessor's guarantee of the lease payments. Petitioner emphasizes that respondent has taken a position in this case inconsistent with TAM 8643002. We recognize that technical advice memoranda are not precedent. Sec. 6110(j)(3); see also Williamson v. Commissioner, 974 F.2d 1525, 1535-1536 (9th Cir. 1992), affg. 93 T.C. 242 (1989); Transco Exploration Co. v. Commissioner, 95 T.C. 373, 386 (1990), affd. 949 F.2d 837 (5th Cir. 1992). We find, however, that the factors mentioned in the above TAM are particularly significant in construing the transactions between petitioner and Norwest. Under the Master Assignment, petitioner granted Norwest a security interest in the leased equipment, petitioner guaranteed that all lease payments would be paid, and petitioner agreed to repurchase from Norwest any lease in default. These factors support petitioner's position that the transactions between petitioner *145 and Norwest should be treated as loans. Norwest's potential loss with respect to each lease was greatly limited by petitioner's contractual obligation to accept a reassignment, on Norwest's demand, of any lease in default and to pay Norwest an amount reflecting the discounted value of the remaining unpaid payments due under the lease. Thus, after an assignment to Norwest, petitioner retained the risk of loss in case of a default by a lessee, and Norwest could suffer a loss only if petitioner was unable to honor its obligation. Norwest's rate of return on the transactions with petitioner was limited to the discount or interest rate factored into the calculation of the funds it provided to petitioner. Thus, under the Master Assignment, petitioner had the typical risks of loss associated with ownership of the leases, and only petitioner could profit from the leases and the equipment beyond the initial interest rate factored into calculation of the repayments due Norwest for providing funds to petitioner. See Illinois Power Co. v. Commissioner, supra at 1438. The facts and issue in Coulter Electronics, Inc. v. Commissioner, supra, *146 are substantially similar to the facts and issue in this case. In Coulter Electronics, Inc., the agreement at issue contained terminology suggesting both a sale and a loan. The agreement in Coulter Electronics, Inc., required the lessor to maintain insurance on the equipment, to timely pay all taxes and other liabilities, to accept a reassignment of any lease in default, and to provide financial statements to the financing company. In Coulter Electronics, Inc., we concluded that the transactions constituted loan transactions and not sales. We find no meaningful basis upon which to distinguish the facts in Coulter Electronics, Inc. from the facts of this case. For financial accounting and for Federal income tax purposes, both petitioner and Norwest treated the assignments to Norwest as financing transactions. Petitioner treated the transactions with Norwest the same as petitioner treated loans received from commercial banks. The evidence indicates that both petitioner and Norwest intended that the transactions consummated between them under the Master Assignment would constitute loans and not sales. We are satisfied and so conclude that the benefits and burdens *147 of ownership of the leases and of the lease payments remained with petitioner and that, in form as well as in substance, the transactions between petitioner and Norwest constituted loans. Thus, the assignments by petitioner to Norwest of the lease payments due are to be treated as pledges to secure loans and not sales. Respondent argues that the Danielson rule or the strong proof rule should apply in this case and that under either rule the "sale" terminology in the Master Assignment should require a holding that the transactions between petitioner and Norwest be treated as sales for Federal income tax purposes. In Commissioner v. Danielson, 378 F.2d 771, 775 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965), the Court of Appeals enunciated a rule under which "a party can challenge the tax consequences of his agreement as construed by * * * [respondent] only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." The Tax Court, however, does not apply the *148 Danielson rule except where we are constrained to do so because the case before us is appealable to a Court of Appeals that has adopted the rule. Venue for appeal of this case would lie to the U.S. Court of Appeals for the Seventh Circuit, which has indicated its acceptance of the strong proof rule. See Kreider v. Commissioner, 762 F.2d 580, 586-587 (7th Cir. 1985), affg. T.C. Memo. 1984-68. This Court generally does not follow Commissioner v. Danielson, Supra, see Elrod v. Commissioner, 87 T.C. 1046 (1986), and, in any event, neither the rule of that case nor the strong proof rule would apply where neither party attempts to vary the terms of the agreement but seeks only a construction of a clearly ambiguous agreement in a manner favorable to its position. Elrod v. Commissioner, supra at 1066; Smith v. Commissioner, 82 T.C. 705, 713-714 (1984); Coulter Electronics, Inc. v. Commissioner, T.C. Memo. 1990-186, affd. without published opinion 943 F.2d 1318 (11th Cir. 1991). *149 That is the situation presented to us here. On its face, the Master Assignment is ambiguous and therefore its exact nature for Federal income tax purposes must be determined, which we have done, from the documents as a whole and in light of all the surrounding facts and circumstances in evidence. See Strutzel v. Commissioner, 60 T.C. 969, 976 (1973); Coulter Electronics, Inc. v. Commissioner, supra.
We hold for petitioner. Decisions will be entered under Rule 155.